Argued November 6; reversed December 3, 1946

In re Holland's Estate
CHAMBERS et al. *v.* STUDEBAKER et al.
(175 P. (2d) 156)

[ 1 ]

*George J. Perkins,* of Portland, for Annabelle Chambers, and Mary Bean, residuary devisees and legatees, appellants.

*Ernest Cole,* of Portland (H. A. Robertson, of Portland, on brief), for Dorman M. Studebaker and Clyde H. Babcock, petitioners for construction of will, respondents.

*Fred W. Bronn,* of Portland, on brief, for The United States National Bank of Portland (Oregon), as executor of the estate of O. H. Holland, deceased, respondent.

Before BELT, Chief Justice, and ROSSMAN, LUSK, BRAND and HAY, Justices.

ROSSMAN, J.

This is an appeal by Annabelle Chambers and Mary Bean, residuary legatees under the will of O. H. Holland, deceased, from a decree of the Circuit Court for Multnomah County, which held that the will devised to Dorman M. Studebaker a life estate, and to Clyde H. Babcock the remainder in Lot 7, Block 145, Portland. The respondents are Studebaker, Babcock and the executor of the deceased's estate. The executor is not a partisan upon the appeal and we shall hereafter refer to Studebaker and Babcock as the respondents. They are not related to the testator. The residuary devisees are his nieces.

This proceeding was instituted by a petition which

prayed for a construction of the following part of the will:

"Third: I give, devise and bequeath to Dorman M. Studebaker, a life estate in the residence in Portland, Oregon, that I now occupy on 1516 S W 4th Ave; together with the furniture, as it is in the home at the time of my decease.

"Fourth: I give, devise and bequeath to Clyde H. Babcock, 1516 S. W. Fourth Avenue,

"Fifth: * * * ."

Paragraph 7 devised to the appellants the residue of the estate.

Mr. Holland, the decedent, was the owner of Lot 7, Block 145, Portland, which faces 50 feet on Fourth Avenue. In 1875 a previous owner built two houses upon the lot; each faces upon Fourth Avenue. In 1923, when the city renumbered properties, it assigned to one of the houses No. 1516 and to the other No. 1510. Their previous numbers were 324 and 320. Numbers 1516 and 1510 were posted over the front doors of the respective houses and were plainly visible. The circuit court construed the descriptive term, "1516 S W 4th Ave" as the equivalent of Lot 7, Block 145.

The deceased acquired Lot 7, Block 145, in 1925. He signed his will June 29, 1944, and died July 9, 1945.

The respondents claim that the two houses are, in effect, one and that Mr. Holland so regarded them. The appellants refute that contention.

The appellants, besides challenging the admissibility of a part of the testimony which the circuit court permitted one W. W. Graves, a witness for the respondents, to give, contend that paragraphs 3 and 4 of the will devised to the respondents no interest whatever in the land upon which stood the house bearing

number 1516. They argue that if paragraphs 3 and 4 bequeathed any interest in the land, then the devise did not extend to all of Lot 7, but only to that part of it which is necessary for the convenient occupancy of the house.

Before delineating the evidence which bears upon that issue, we take note of § 2-218, O. C. L. A., which says:

"For the proper construction of an instrument the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

When the testator wrote his will he thereby penned a solemn message for the courts of Oregon. He knew, of course, that his message would not be delivered to the probate judge until after his death and, therefore, must have realized the importance of expressing clearly the orders which he wanted to give. Although each word which a person puts into a will signifies to him a definite object, person or other concept, yet words rarely have a single dictionary meaning. Their lack of singleness of meaning is especially marked when they are used in combinations such as sentences and paragraphs. Words need to be interpreted; that is, we need to unpack from them the meaning which their user placed in them. This process of unpacking consists of identifying the person, object or other concept which their user had in mind when he uttered them. The process is no different from interpreting the meaning of a traffic signal given by the driver of the car ahead. When he stretches out his arm to the left he has a definite meaning in mind. Each word which a

person employs in a will is associated in his mind with some person, plan or other object. If, as the words flow from his pen, a photographic device could record upon film the procession of persons, objects and other concepts that are passing before his mind, there would be no need for interpretation. We could identify from the film exactly what he had in mind and thus know what he meant. We have, however, no such process. But the legislature has given us § 2-218, O. C. L. A., above quoted, which enables the court so far as possible to fit itself into the place of the person who used the words which are under scrutiny. In an instance like the present its purpose is to enable the judge to know the testator and become acquainted with his family, friends, surroundings and all other circumstances which throw light upon the meaning of the words he used. In this way the court, it is believed, can better extract from each word the meaning which the testator expected it to convey. As was said in *Stubbs v. Abel, et al.,* 114 Or. 610, 233 P. 852, 236 P. 505, the purpose is to enable the judge to fit himself into "the position of the testator, in order to think as he thought, and to understand as he understood." But none of our law empowers the court to determine what the testator intended to say: § 2-216, O. C. L. A.: *Hansen v. Oregon Humane Society,* 142 Or. 104, 18 P. (2d) 1036; Page on Wills (Lifetime Ed.), § 914; Wigmore on Evidence (3d Ed.), § 2459.

With the above considerations in mind, we shall now review the evidence which is intended to show the meaning of the phrase, 1516 Southwest Fourth Avenue.

The two houses on Lot 7, Block 145, were built for family occupancy. The larger, No. 1516, is three stories high and contains sixteen rooms; the smaller, No. 1510,

consisting of two stories and an attic, contains eight rooms. The ground dimensions of the two are different—No. 1516 is 26.3 feet wide, and No. 1510 is 16.4 feet wide. Each has its own foundation. The houses stand 4.3 feet from each other. No. 1516 stands back two feet, and No. 1510, 5.8 feet from the street line. Each has a separate front porch. Both houses are of frame construction. Some time after they were built they were converted into rooming or apartment house purposes. Mr. Holland, apart from occupying three rooms in No. 1516 as his home or residence, devoted both places to rooming or apartment house purposes. In No. 1510 there is neither a bathroom nor a toilet room. The second floor of No. 1516 has a bathroom and adjacent to it is a lavatory. In the space of 4.3 feet between the two houses there is a board walk which leads from the street to the rear of the houses, about 40 feet. At the farther end of the walk is an outside toilet room which is divided into two compartments. Each contains a lavatory, one for each house.

After he acquired ownership of the property Mr. Holland built an enclosed passageway from the second floor of one house to the second floor of the other. Since the two houses are only 4.3 feet apart, the length of the passageway is 4.3 feet. It is eight feet wide. Apparently it was intended to serve a double purpose: 1) to constitute a part of the fire escape which serves both houses, and 2) to afford the occupants of No. 1510 access to the bathroom and the toilet room on the second floor of No. 1516. The extent to which anyone used the passage is not disclosed by the record.

The same water and electric meters served both houses. Each, however, had a gas meter. Whatever hot water was available to the tenants came from a tank

in the kitchen of the deceased's apartment. Whether or not No. 1510 was connected with the supply is not disclosed by the record. It is seen from the above that No. 1516 was complete within itself; that is, it had both a bath and a toilet room.

The apartments or rooms in the two houses were numbered and, since the respondents direct attention to the numbering, we shall mention it. Apartments 1 and 2 are on the ground floor of No. 1516. Apartment 3 is on the ground floor of No. 1510; 5, 6 and 7, which seemingly are single rooms, are on the ground floor of No. 1516; 8, 9, 10 and 11 are on the third floor of the same structure; 12 and 14 apparently are in the attic of No. 1510; and 15 and 16 are on the second floor of No. 1510. It will be observed that some of the numbers run through the structures.

Three years or so prior to Mr. Holland's death, officials of the city of Portland demanded that he make extensive repairs, improvements and additions to the property if he wished to continue to use it for rooming and apartment house purposes. They insisted that the scant amount of plumbing and the deteriorated condition of the buildings violated the city's fire, health and building ordinances. They threatened to condemn the houses unless Mr. Holland met their demands. The evidence indicates that Mr. Holland thought that the cost of complying with the city's demands would not be warranted by the rentals which the property was capable of yielding. When the city was on the verge of condemning the houses as unfit for the purposes to which they were devoted, the great demand for rooms in the city, precipitated by World War II, prompted the officials to cease pressing their demands.

The will which is the subject of this appeal was pre-

pared by Mr. W. W. Graves, a Portland lawyer, who testified during the course of the proceeding. His testimony warrants an inference that during the several conferences which he had with his client before he succeeded in writing the will which was executed, Mr. Holland never employed the term, Lot 7, Block 145, but always spoke of No. 1516 Southwest Fourth Avenue. It is likewise evident from Mr. Graves' testimony that he did not know that another house stood upon the same lot with No. 1516. Before the will was signed Mr. Graves had not visited the property; in fact, he did not see it until after the execution of the instrument. Since he did not know that another house besides No. 1516 stood upon the lot, it seemingly did not occur to him to ask questions concerning the subject; at any rate, he asked none. Likewise, since the client was not talking about Lot 7, Block 145, but about No. 1516 Southwest Fourth Avenue, he did not disclose the existence of No. 1510.

Mr. Graves swore, "I dictated several wills" before producing the one which Mr. Holland signed. Upon more than one occasion, according to him, he asked for a deed covering the property to which Mr. Holland was referring as No. 1516 Southwest Fourth Avenue so that he could secure from it the legal description. Mr. Holland never produced the deed, but told Mr. Graves, so the latter swore, that he "did not need the legal description, that the house number was enough." Mr. Graves, again referring to his client and the deed, testified: "He didn't want to bring it in; he said it wasn't necessary." It is clear that Mr. Holland had a deed covering Lot 7, Block 145, for on a previous visit to Mr. Graves' office for another purpose he had the deed in his hand. If his client ever told Mr. Graves that he wished to devise to the respondents the entire

lot, Mr. Graves, as a witness, did not disclose that fact. His supposition that Mr. Holland wanted to bequeath a lot was apparently drawn from his general experience in the drafting of wills.

When Mr. Graves wrote the third paragraph he left blank the space which now contains the phrase, "1516 S W 4th Ave" and it remained blank until just before the testator signed the paper. For instance, Mr. Graves testified:

"I got the will up; when I dictated the will I left that so he would bring his deed in. I told him to bring his deed in."

But, as previously stated, the deed was not produced, and accordingly when Mr. Holland was ready to sign the paper Mr. Graves lacked the legal description of the lot upon which No. 1516 Southwest Fourth Avenue stood. He intended to insert it in the blank space. At that juncture the following occurred, according to his testimony:

"When he came in he didn't have his deed, and still insisted that was all that was necessary. I said, 'You are sure of your street number, No. 1516, you told me the other day?' He said, 'Yes.' I said, 'You write it in your will yourself.' I didn't want to do it by street number."

Mr. Holland thereupon chose the expression, "1516 S W 4th Ave" and wrote it into the blank space. Mr. Graves, testifying further concerning the same episode, said:

"I couldn't get hold of the description, the legal description, to draw the will. He wanted it done just that way,"

that is, Mr. Holland wished to designate the property

which he was devising by describing it as "1516 S. W. 4th Ave". The attorney also testified:

"He (Holland) filled that in at the time he signed the will."

It was in that way that the term "1516 S W 4th Ave" was written into the third paragraph of the will.

The fourth paragraph of the will contains the typewritten words, "1516 S. W. Fourth Avenue," but it concludes with a comma. Upon Mr. Graves' dictation his stenographer wrote not only the words just quoted but also the comma. The use of the latter indicates that Mr. Graves intended to add something further. He swore that he planned to insert after the comma the legal description of the property at No. 1516 Southwest Fourth Avenue, in the event that Mr. Holland brought the desired deed. Evidently the testator when he read the instrument was satisfied with the fourth paragraph; that is, with the phrase, "1516 S. W. Fourth Avenue" and, hence, nothing was added at that point. The entire will, apart from the date, signatures and the term "1516 S W 4th Ave", which is found in the third paragraph, is typewritten. Thus the descriptive part which we are called upon to construe is the only part which the testator wrote with his own pen, apart from its repetition in typewritten form in the fourth paragraph.

When the city officials were threatening to condemn the two buildings, Mr. Holland again consulted Mr. Graves. At that point Mr. Graves visited the property and inspected the houses. Obviously, since his client consulted him about both of the houses, he must have observed that two houses, not one, stood upon the lot. The visit was the first which Mr. Graves made to the property and occurred after the will was executed.

He testified:

> "I went up with him and looked—. After the will was drawn I went up and looked at the buildings. I told him that I thought they were a fire hazard. He wanted to resist the city making him change these buildings."

Whether or not Mr. Graves, upon seeing that two buildings, and not merely one, stood upon the lot, discussed with Mr. Holland the descriptive phrase, "1516 S W 4th Ave" which was in the will is not disclosed by the record. In view of the fact that Mr. Graves had repeatedly asked his client for a deed to the property and in its absence had him write into the will in his own handwriting the descriptive term, which, it developed upon a visit to the property, covered only one of the two buildings, it would seem that Mr. Graves must have been surprised at what he saw, unless he inferred that Mr. Holland wished to devise only the building which bore No. 1516. As a matter of fact, Mr. Holland, shortly after this visit to the property, talked to Mr. Graves concerning his will; in fact, he had him prepare the draft of another will. This request grew out of the testator's fears that the city might condemn the property and require him to demolish the houses. If condemnation occurred he wanted to change the devise of that property. We now revert to Mr. Graves' testimony; and explain that the questioning at the outset concerned the cost of repairing the houses.

> "Q. Did you have any conversation with him as regards to whether it would cost any money to fix those?

> "A. He told me it would cost between twelve and fifteen hundred dollars. If he had to put that in he was going to draw another will.

"Mr. Cole: Will you mark this for identification."

At that point an unsigned will was produced. The examination then continued:

"Q. I will hand you this. Is this the will he had you dictate in case he had to repair those buildings?
"A. Yes, sir, that is the will.

"Q. Was it a fact that he would go ahead and execute that if he had to repair those buildings and put them in the condition in which the city required?
"A. That is what he told me.

"Q. Otherwise that will was to stand?
"A. That will was to stand."

When Mr. Graves prepared the draft of the will to which the examination just quoted referred, he knew that alongside of No. 1516 there stood another structure bearing No. 1510 which his client also owned. We now quote the following from this draft:

"Fourth: I give, devise and bequeath to Daniel Beach, my brother-in-law, of Eagle, Idaho, a life estate in an undivided one-half interest in No. 1516 S. W. Fourth Avenue, Portland, Oregon; and the remaining undivided one-half interest in said No. 1516 S. W. Fourth Avenue, Portland, Oregon, I give devise and bequeath a life estate to Clyde H. Babcock, of Portland, Oregon."

Thus, after Mr. Graves observed that two houses stood upon the one lot, he employed in the above draft, "No. 1516 S. W. Fourth Avenue" to designate the property which his client wished to devise. No one claims that Mr. Graves deemed the two houses a single unit. It is evident from the above that the decedent approved the

draft; that is, the use of the phrase, 1516 Southwest Fourth Avenue, as the description of the property which he wished to bequeath. In phrasing the facts in the foregoing manner, we imply no criticism of Mr. Graves. As a witness, he narrated the facts, and as the attorney for Mr. Holland he had sought to reduce to writing his wishes.

Since we are called upon to determine whether the two structures which the city of Portland identified with the numbers 1510 and 1516 were deemed by those familiar with the property as a single unit, we shall now turn to the testimony of those who visited it from time to time and of others who lived in the structures.

According to the testimony, mail for the occupants of No. 1510 and of No. 1516 was delivered to the respective structures. Upon the assessment rolls of the county assessor the two houses were deemed separate units. The fire department officials and the building inspector, in their negotiations with Holland which we have already mentioned, regarded the houses as separate. So also did the appraisers who placed a value upon the decedent's estate. The witnesses in testifying spoke of the houses as being two in number, not one. To illustrate, we turn to the direct examination of the respondent, Babcock. The questions are those of the respondents' attorney who generally sought to avoid the use of the plural form of the noun "building" and, therefore, used such terms as "building", "parts" and "1516."

"Q. Does that serve both parts there?
"A. It serves both houses.
"Q. Where is the water meter?
"A. The water comes right out in the alleyway between the two buildings.

"Q. Does one water meter serve both buildings?

"A. One water meter serves both buildings.

"Q. And the gas?

"A. The gas has two meters, one meter under 1510 and one meter in the basement of 1516."

From direct examination of another of the respondents' witnesses, the following is taken:

"Q. Where is the fire escape?

"A. It is between the two buildings.

"Q. Does it serve both buildings?

"A. Yes, sir."

We now revert to the testimony of Mr. Graves. The questions quoted were propounded by the respondents' attorney.

"Q. Those buildings up there, do you know at that time whether he was having any trouble about the buildings?"

It will be observed that the question referred to the structures in the plural form, "buildings".

"A. He was having trouble with the department here, the fire department and the health department.

"Q. What was the trouble, what was the nature of it?

"A. They were condemning the buildings."

Mr. Graves constantly referred to the houses by the use of the plural form—obviously he did not deem them a single structure. During the examination of Mr. W. H. Phillips, the city building inspector, who was a witness for the appellants, the following occurred:

"A. I think at a previous date that the Health Department and the Fire Department had agreed it would be allowable for him to use them as rooming houses but not as apartment.

"Q. Did they regard the two structures as being separate buildings?

"A. I think so. I don't see how they could be otherwise.

\* \* \*

"Q. Tell me whether the City regarded those as separate buildings or as one building.

"A. I should certainly say they are separate buildings.

"The Court: Separate buildings?

"A. Yes, they are separate buildings."

The above, we believe, is a fair review of the parts of the record which show the nature of the passageway which Mr. Holland built and also the meaning of the phrase, 1516 Southwest Fourth Avenue, accorded to it by people who were familiar with the property. To us, it seems that the two houses were not made into one by the construction of the passageway and that they retained their separate identities after it was built. It not infrequently happens that two buildings are connected with a passageway which permits the occupants of each to pass back and forth. Generally, in such instances, the passageway no more makes the two structures one than does the Straits of Mackinac unite into one Lakes Huron and Michigan. Even when two structures have been connected together, those who do business in them may prefer for purposes of convenience to deem them separate. The important question before us is not whether the passageway actually made the two houses one, but whether or not those familiar with the property deemed the phrase, 1516 Southwest Fourth Avenue, as the designation of both houses. In other words, what did that term mean in common parlance.

It is clear that those who used the term, 1516 South-

west Fourth Avenue, regarded it as referring only to the house which bore that number. For example, letter carriers with mail for No. 1510 Southwest Fourth Avenue delivered it, not to No. 1516, but to No. 1510. Likewise mail for No. 1516 was delivered to the door which bore that number. The county assessor and other public officers regarded the structures as separate. Seemingly a delivery boy with a package for No. 1510 would have brought it to that number, and not next door. Thus, when Mr. Holland wrote into his will the term, "1516 S W 4th Ave", he meant the property which bore that street number—if he used the term in the sense in which others employed it. We are satisfied that the general acceptation of the term, 1516 Southwest Fourth Avenue, meant the house which bore that number. It did not include No. 1510.

■ Although normally words are used in their general sense, they are not always employed in that way: Wigmore on Evidence, 3d Ed., § 2460. See also *Hurst v. W. J. Lake & Co.*, 141 Or. 306, 16 P. (2d) 627, 89 A. L. R. 1222. Sometimes a person uses a word or a term in a sense which is peculiar or individual to himself. If he so uses it in a document which is unilateral, such as a will, it can readily be given his individual meaning, provided it can be determined with the required degree of certainty.

Section 2-219, O. C. L. A., says:

"The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a technical, local, or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement shall be construed accordingly."

During the trial the respondents made an effort through three witnesses to show that when Mr. Holland gave receipts to his tenants for their rental money he referred to the entire property as No. 1516; that is, that he used the term "1516 Southwest Fourth Avenue" as descriptive of both buildings.

The first of the three witnesses was the respondent, Studebaker, who had performed chores for Holland over a course of several years. Concerning rental receipts, he testified:

"Oh, he did different ways. Sometimes he would just put it—most generally just write their name, 1516, and how much it is. I don't know as I ever seen him write one 1510; he may have, but I never did see it if he did. Sometimes he didn't put the room number on it. He just put their name and his house number."

That is all the testimony he gave upon that subject. The second of the three witnesses was the respondent, Babcock. During several winters he occupied a room in No. 1516. Referring to Mr. Holland, he said, "He gave his receipts as 1516 Southwest Fourth on the whole house," but added, "I don't think you can find any place in any of his receipts where he give 1510; not that I ever saw." At that point an objection was made that the receipts themselves were the best evidence, whereupon Babcock volunteered the information that "the administrator has receipt books, or, at least, I turned them over to him." The objection was then amplified with a demand that the receipt books be produced, whereupon Babcock added, "I don't even remember any concerning 1510, although there may be." At that juncture the respondents' attorney declared, "We will get to that later on", and the witness

said virtually nothing more concerning receipts. The third witness was a Mrs. Harriette Crittendon, who at one time occupied a room in No. 1516. When she was asked whether she ever saw receipts written by Holland, she replied:

> "Well, I think I have at different times, but most of his receipts were written out 1516."

After that testimony had been given, the appellants' attorney stated:

> "I understand, your Honor, if these receipts are available this testimony will all be stricken out."

The respondents' attorney replied, "Yes." No one again mentioned receipts. The above is all that the record contains upon the subject. No receipts were produced and no explanation of that fact appears in the record. We observe that Maud L. Beach, a sister-in-law of the decedent, as a witness for the appellants, testified that she lived for eleven years at No. 1516 Southwest Fourth Avenue and that her brother-in-law always regarded the houses as separate units. The respondents, upon cross-examination for the purpose of showing that the witness was biased, developed the fact that she and her brother-in-law had a misunderstanding which engendered ill will.

■ It appears to us that the testimony of the respondents and of their witness, Mrs. Crittendon, fails to show that Mr. Holland had a habit of referring to both structures by the appellation, 1516 Southwest Fourth Avenue. An occasional or casual use of a term in an unorthodox sense by a person cannot justify a court in placing that meaning upon it when interpreting his will. It is necessary that it appear that the testator

used the term habitually in the unorthodox manner. As justification for that statement, we depend upon § 2-219, O. C. L. A., which says:

"The terms of a writing are presumed to have been used in their primary and general acceptation."

See also Wigmore on Evidence, 3d Ed., § 2467.

■■ The above, we believe, constitutes a review of all the material admissible testimony. The respondents presented additional evidence given by Mr. Graves which was intended to show, not the meaning of the words of the will, but the intention of the testator. For reasons already stated, this testimony was inadmissible. They also produced evidence that the testator after he had signed his will stated that he would bequeath, or had bequeathed, several thousand dollars to the respondent, Studebaker, and something to the respondent, Babcock. No citation of authority is necessary to hold that this testimony was both immaterial and inadmissible. Then, there is also the fact that Babcock is sixty years of age and Studebaker is forty-seven. Although it seems illogical to give a life estate to a man who is much younger than the remainderman, yet the arrangement, illogical though it may have been, throws no light upon the meaning of the term, 1516 Southwest Fourth Avenue. The record, however, contains some explanation of the novel devise just mentioned.

■ From the foregoing we see that 1) the two houses retained their separate identities even after the passageway was built; 2) common acceptation accorded to the term, 1516 Southwest Fourth Avenue, a meaning which did not include the structure which bore No.

1510; and 3) the testator did not use the term, 1516 Southwest Fourth Avenue, in any sense peculiar to himself, as, for instance, as including No. 1510. The three groups of circumstances just mentioned readily justify a holding that Paragraphs 3 and 4 refer only to the house which bore No. 1516. However, there are other facts in the record which we have already reviewed and which render inevitable the conclusion that when the testator used the phrase, 1516 Southwest Fourth Avenue, he meant only the house which bore that number. For instance, when Mr. Graves repeatedly requested Mr. Holland to bring to him a deed so that he could write into the will the legal description of the lot upon which stood No. 1516, he thereby confronted Mr. Holland with the question of choosing between a description that would have devised the entire lot or the term, No. 1516 Southwest Fourth Avenue, which covered only one of the two buildings upon the lot. Had Mr. Graves made his request only once, it is possible that Mr. Holland might not have caught the full significance of the problem which confronted him, but the request was repeated. A real edge was given to the problem which Mr. Graves placed before his client when he left blank the space in the third paragraph of the will before submitting it for execution, and told him, ''You write it in the will yourself.'' At that point Mr. Holland wrote in the will the descriptive term which we have seen described only one of the two houses. In the house which he named the testator made his residence or home. Both of the nouns just mentioned occur in the third paragraph which undertakes to describe the property devised.

■■ The appellants do not deny that a will may describe real property, made the subject matter of special

devise, by its street or house number. Instances which recognized the validity, but not the desirability, of so describing property are cited in the following passages: Page on Wills (Lifetime Ed.), § 952, and 69 C. J., Wills, p. 381, § 1408. See also *Gilbert v. McCreary,* 87 W. Va. 56, 104 S. E. 273, 12 A. L. R. 1172; *In re Wolf's Estate,* 128 Cal. App. 305, 17 P. (2d) 1052; *Will of Griffith,* 165 Wis. 601, 163 N. W. 138, and *Italian-American B. & L. Assn. v. Russo,* 132 N. J. Eq. 319, 28 Atl. (2d) 196. As we said, the appellants do not challenge the sufficiency of the description; to the contrary, their brief says: ''The property description in the will is definite and unambiguous.'' Any description which is ''definite and unambiguous'' is sufficient.

■ The suggestion of the appellants that the devise to the respondent, Studebaker, of a life estate in the residence at No. 1516 Southwest Fourth Avenue gave him an interest in the house only, and not in the land, encounters the rule which is thus stated in an annotation at 12 A. L. R. 1179:

''It is well settled that a devise of a 'house' or 'dwelling house' carries with it the land on which the house stands, and that appurtenant thereto.''

See to like effect, Page on Wills (Lifetime Ed.), §§ 952 and 959, and 69 C. J., Wills, p. 378, § 1403. *Italian-American B. & L. Assn. v. Russo,* supra, cites some of the earlier authorities which were concerned with the rule. The appellants do not dispute the rule which we quoted from the above-cited annotation, but say:

''We are not unmindful that there are court decisions holding that where a house or building is identified by a will and devised, the instrument will be construed as conveying so much of the land on which the house or building is situated as is

necessary for the convenient occupation and use of the structure. In this instance, the testimony shows that the building devised, No. 1516 Southwest Fourth Avenue, Portland, Oregon, was old, unsanitary and unfit for human habitation and was about to be condemned by the city authorities when the will was made. The testator knew it would only be permitted to stand a short time. Under the conditions it is a reasonable inference that the testator intended only to give Dorman M. Studebaker the building so long as it was permitted to stand, and perhaps the salvage when it was razed.''

We do not believe that the inference the appellants draw from the situation described by them is a reasonable one. If their inference is warranted, then the testator intended to give Studebaker virtually nothing except some worn-out boards. The rule that the devise of a house, residence or homestead includes the curtilage is well known to all draftsmen who prepare testamentary instruments. We do not believe that the dilapidated condition of a house, mentioned in a will as the testator's home, should cause a court to infer that the testator intended to bequeath only the worn-out lumber, and not the land. The evidence creates the impression that Studebaker and Babcock were cronies of the testator. They appear to have been nearer to his heart than his nieces who lived in distant Illinois, and whom he named as the residuary legatees of his estate. Very likely the testator, whom one of the witnesses described as a former gambler, made the provisions for his nieces out of a sense of family duty, but gave to his ne'er-do-well companions from the bottom of his heart. We conclude that the provisions of the will which devised the home include not only the house, but also as much land as is necessary for the beneficial use of the house.

The appellants have not asked us to indicate the exact amount of land which is included within the phrase, 1516 Southwest Fourth Avenue. We believe that the parties will experience no serious difficulty in agreeing upon the amount. The two houses crowd the front half of the lot, and the needs of both houses should be considered when there is apportioned to the respondents their part of the lot. No. 1510 stands only 1.5 feet from the north line of the lot and No. 1516 stands an equally short distance from the south line. Clearly, the respondents will be entitled to the space of 1.5 feet between No. 1516 and the south line. Very likely there should be awarded to them one-half of the space of 4.3 feet which is between the houses. How much of the rear yard should be apportioned to the respondents will be determined by the circuit court, unless the parties agree upon it.

Finally, the appellants argue that Paragraph 4 of the will is incomplete and that it does not bequeath to the respondent, Babcock, the remainder. It will be recalled that Mr. Graves testified that he intended to write after the comma which concludes the paragraph the legal description of the property. His statement, which was deduced upon cross-examination, does not solve the problem which confronts us.

It may be, as the appellants suggest, that the words, "1516 S. W. Fourth Avenue," which are separated from Babcock's name by a comma, were intended to describe or identify him. If that is so, the comma constituted proper punctuation and paragraph 4 is incomplete. In that event, it gives nothing to Babcock. Since the will was not signed until after the testator had made several visits to the office of his attorney, and not until the latter had submitted to his client

several drafts, it is illogical to infer that the testator chose to sign an incomplete will.

The contention that the phrase, 1516 S. W. Fourth Avenue, is not a description of that which was devised, but only a term intended to identify Babcock, encounters the circumstance that paragraph 3, which bequeaths to Studebaker a life estate in the property at No. 1516 Southwest Fourth Avenue, contains no description of him. There would have been as much occasion to identify him by adding after his name his residence address as to identify Babcock. If paragraph 4 gives nothing, then the will contains no devise of the remainder in the home property except so far as the remainder passes by the residuary clause. Paragraph 4, it is true, does not employ the word "remainder" or any of its synonyms, but it follows the third paragraph which concededly bequeaths a life estate.

Although the poor draftsmanship of the fourth paragraph caused by the omission of a word like "house", "residence" or "home" from in front of "1516 S. W. Fourth Avenue", causes misgivings, yet in paragraph 4 of the alternative will which is quoted in this opinion, the same omission occurs. It, too, speaks of "No. 1516 S. W. Fourth Avenue" without preceding that term with "house", "home" or "residence".

■ If paragraph 4 is incomplete, no amount of evidence can complete it: § 18-201, O. C. L. A. We do not believe that it ought to be deemed incomplete if it can be regarded as complete without doing violence to good sense and to the rules which govern the construction of wills. The fact of paramount importance is that the testator signed this instrument containing, as it does, paragraph 4. Obviously, since he had directed his attorney to prepare a will, he did not deem the instru-

ment which he was signing incomplete. Before he executed it he took his pen in hand and completed paragraph 3, which the attorney had purposely left incomplete, by writing into it the same phrase which is found in paragraph 4. To that extent at least, the testator showed. that he was familiar with the document before us.

Paragraph 4, we believe, is capable of an interpretation that the testator wanted Babcock to have the remainder in the home property, that is, in the house which bore No. 1516. We believe that interpretation is a reasonable one. It would be much easier to reach that conclusion if Mr. Graves had omitted the comma which appears after Babcock's name and in its place had inserted ''the remainder in.'' It not infrequently happens that courts ignore punctuation found in wills: Page on Wills (Lifetime Ed.), § 936. Where it is clear that a word or an expression has been omitted from a will, the courts supply it, provided they are certain of the omitted term: 69 C. J., Wills, p. 82, § 1140. Paragraph 4, which appears to give the fee, can be reconciled with paragraph 3, which gives a life estate, by omitting from paragraph 4 the comma which follows Babcock's name and inserting there ''the remainder in.'' We think that under the circumstances the three words just suggested are implied by the language of paragraphs 3 and 4. We do not believe that any violence is done to the rules of construction by reading those words into paragraph 4. To the contrary, an insertion of them into paragraph 4 gives a reasonable interpretation to the entire will and reconciles the two paragraphs. But, after all, the question occurs, what did paragraph 4 mean to the testator when he read it. The term, 1516 Southwest Fourth Avenue, meant to him his home. In

paragraph 3 he had devised to his friend, Studebaker, a life estate in that property, and, hence, he knew when he came to paragraph 4, which concerned his other friend, Babcock, that he had left only the remainder in the property. We think that paragraph 4 meant to him a devise of the remainder. Without further analysis, we express our concurrence in the circuit court's holding that paragraph 4 devised to Babcock the remainder in the property at No. 1516 Southwest Fourth Avenue.

The decree of the circuit court is vacated and the cause remanded to that court with instructions to proceed in conformity with the foregoing.