Argued November 7, 1946; affirmed January 7, 1947

# REED ET AL. *v.* MONTGOMERY

(175 P. (2d) 986)

*William J. Prendergast, Jr.,* of Portland (Leo Levenson, of Portland, on brief), for appellants.

*Reese Wingard,* of Eugene, and *Frank B. Reid,* of Eugene, for respondent.

Before BELT, C. J.,* and ROSSMAN, LUSK, BRAND and HAY, JJ.

ROSSMAN, C. J.**

This is an appeal by the plaintiff from a decree of the circuit court which held that (1) a document, contractual in form, quoted in the complaint and constituting the basis of the plaintiffs' suit, was not "a completed contract," that it did "not constitute a meeting of the minds" of the parties, and that the defendant was not bound by it; (2) the paper just mentioned conferred no lien in favor of the plaintiffs upon any property owned by the defendant; (3) a sum of $1,500, which was paid by the plaintiff, W. D. Plue, to the defendant concurrently with the signing of the aforementioned paper by Plue, belonged to him; and (4) the complaint should be dismissed.

* Chief Justice when this case was argued.
** Chief Justice when this opinion was rendered.

The aforementioned document reads as follows:

"This agreement between L. Montgomery, Jr., by Lewis Montgomery, his attorney in fact, first party, and W. D. Plue and Chas. Reed, second party, in consideration of the mutual promises of said parties, and for other valuable consideration,

## WITNESSETH

Whereas first and second parties desire to pool their various properties as hereafter set forth and to carry on business therewith,

It is agreed that first party shall put into the business one yarder, two loaders, 1 cat. #60, two trucks and trailers and camp buildings, the same being located on S. E. 114 of N. W. 114, Section Twenty-five (25), Township Nineteen (19) South, Range Seven (7) West in Lane County, Oregon, said property being valued at Fifty-five Thousand ($55,000) Dollars.

Second party agrees to immediately pay Fifteen Hundred ($1500.00) Dollars and put in their equity in one yarder, two loaders, 1 cat., lines, blocks, etc. against which property there is Eight Thousand Two Hundred Fifty ($8,250.00) Dollars payable Seven Hundred Fifty ($750.00) Dollars per month commencing in August, 1944. The equity in said property, plus the cash, totalling an agreed interest of Thirteen Thousand Two Hundred Fifty ($13,250.00) Dollars.

It is agreed that each of the parties has an interest in the business in proportion to the values herein set forth.

It is understood that the Fifteen Hundred ($1500.00) Dollars paid shall be forthwith paid for the extension of the option with Porter Brothers for timber in Township Nineteen (19) and Twenty (20) South, Range Seven (7) West in Lane County, Oregon.

It is understood that this is a temporary agreement further details to be included in a more par-

ticular agreement to be later drawn up between the parties.

Dated this 31st day of January, 1944.

L. Montgomery, Jr.,
    By Lewis Montgomery
First party by his attorney in fact.
W. D. Plue,
Chas. Reed,
    By W. D. Plue,
Second party.''

The appellants are W. D. Plue and Charles Reed, who were the plaintiffs in the circuit court, and whom the paper terms the ''second party.'' The defendant-respondent is L. Montgomery, Jr., who is described in the paper as the ''first party.''

■ The appellants' brief submits only one assignment of error. It follows:

''The Court erred in not finding the equities of the suit with Appellants.''

Although that statement is too general to single out specific error and qualify as an assignment of error, we shall ignore that shortcoming. Immediately following the words just quoted, the appellants set forth four Points and Authorities, the first of which is:

''The relationship between joint adventurers, like that existing between partners is fiduciary in character, and imposes upon all participants an obligation of loyalty, good faith and honesty.''

Thus, it is seen that the appellants take it for granted that the document above quoted created a contractual relationship between the parties and that its nature was that of joint adventurers. The other three statements

made under the head of Points and Authorities develop the duties and status of a joint adventurer.

The purpose of this suit, as expressed in the prayer of the complaint, was to gain a decree ordering the respondent to account to the appellants "for the value of plaintiffs' interest in said timber and logging business and the profits derived therefrom, and for judgment thereon."

The complaint avers:

" * * * plaintiffs and defendant entered into an agreement and promised and agreed to and with each other to combine their joint efforts, properties and means in purchasing certain valuable tracts of timber and to cut and log the same, * * * . Defendant agreed to put into the said joint adventure * * * ."

Then follows a list of the personal property which the purported agreement states the defendant owned. The complaint continues:

"Plaintiffs were to advance $1500.00 cash * * * and to put into said joint adventure their interest in one yarder, two loaders, 1 cat. and other logging equipment of the agreed value of $13,250.00. * * * In violation of said agreement, said defendant with fraudulent intent to defraud and cheat the plaintiffs out of their valuable interest in said partnership, did obtain the said valuable timber on his own account and with a total disregard of plaintiffs' rights and interest therein, * * * notified plaintiffs that the agreement heretofore mentioned was cancelled and he repudiated the same and has refused to allow plaintiffs to participate in the joint adventure, * * * ."

The answer alleges that in January of 1944 the defendant was engaged in logging operations and

"had secured from Porter Brothers and the Tide Water Mill Company, at a cost of $1,000.00, an option of purchase for twenty-six hundred acres of timber land at $2.50 per thousand for merchantable timber, with an agreement that an initial payment of $25,000.00 should first be paid * * * . Approximately two or three weeks prior to January 31, 1944, this defendant was approached by W. B. Plue with a proposal that he would finance the purchasing of the timber and that he would raise sufficient capital to construct and equip a one hundred thousand capacity saw mill."

The answer charges that Plue failed to secure funds with which to make payment on the timber or construct a sawmill, and says:

"The defendant knows nothing of the plaintiff Reed, as to who he is or what he is, and alleges that the claims of each of the plaintiffs are wholly fanciful and have no foundation whatever. That the contract attached to the complaint was never made or ratified by this defendant, and this defendant tenders back into Court the $1500.00 heretofore tendered to the plaintiff Plue."

It will be seen from the foregoing that the complaint is based upon a predicate that there existed between the appellants and the respondent a relationship of partners or of joint adventurers. That pleading uses both the terms "partnership" and "joint adventure." According to it, the partners or joint adventurers were associated together for the purpose of acquiring timberlands and engaging in logging operations. The answer, upon the other hand, denies that any contractual relationship existed between the parties. It alleges that a meeting of the minds never occurred to the extent of effecting an agreement. It concedes that negotiations occurred between the re-

spondent and appellant Plue, which contemplated that the two might become associated together in some phase of the timber industry, provided Plue could obtain $25,000 for payment upon some timberlands and another sum for the construction of a sawmill. By reverting to the paper upon which the suit is based, we gain still another impression of the relationship between the parties. It says that the parties "pooled their various properties" so as to enable them "to carry on business therewith," but nowhere specifies the nature of the business in which they proposed to engage, nor the duties to be performed by anyone who is named in the writing. Although the respondent is mentioned in the writing as the "first party" and the two appellants as the "second party", thereby making it appear that it was proposed to create a partnership within a partnership, the paper fails to prescribe the manner in which this involved relationship was to function.

We shall now turn to the evidence.

The appellant, Plue, testified that he had been engaged for forty years in the sawmill business. In January of 1943 he was not occupied with any venture and was seeking an opportunity to re-enter the lumber business. The appellant, Reed, who was a master mechanic, had seen neither the respondent nor the document above quoted until the day of the trial. The respondent had been for many years in the logging business. In May of 1941 he transferred his operations to a place on the upper stretches of the Siuslaw river where he owned 20 million feet of timber. In the immediate vicinity of his property were timberlands owned by Porter Brothers Timber Company and Tide Water Mill Company upon which stood 100 million feet of timber. In October of 1943 the respondent entered

into an agreement with those concerns which granted him an option to purchase their timberlands, provided he paid them $1,000 in December of 1943 and $1,500 February 1, 1944. Upon becoming effective the option required a payment of $24,000 on the purchase price of the land April 1, 1944. The payment of $1,000 above mentioned was timely made. The manner in which the sum of $1,500 was discharged will be mentioned later. The option contract appears to be valuable.

The respondent wished not only to purchase the property owned by the Porter Brothers and Tide Water companies, but also to build a mill near the scene of his logging operations for the manufacture of his logs into lumber. About the time he entered into his agreement with the Porter Brothers and Tide Water companies he and one Peters, as partners, purchased a small sawmill which was located at Sulphur Springs, several miles from the respondent's logging operations. The appellant, Plue, had been a part owner of that mill, and in its sale he and the respondent became acquainted. The latter planned to move the mill to the scene of his logging operations.

Following the sale of the Sulphur Springs mill Plue looked about for an opportunity to re-enter the lumber business and in so doing became interested in a scheme for the co-operative financing of sawmills whereby every employee of the mill purchased stock in the venture. Plue sought unsuccessfully to promote a co-operative mill at Reedsport, and after abandoning the venture had a conference with the respondent which we shall now describe.

In January of 1944, after the Reedsport venture had failed to . materialize, Plue conferred with the respondent in the home of the latter's father. The

appellants claim that it was in the course of that evening's conversation that a meeting of the minds occurred. Those present were Plue and the two Montgomerys. In relating what was said that evening we shall employ Plue's testimony. He swore that the respondent mentioned the timber he owned and his option to acquire 100 million feet more. He spoke of his hopes of moving the Sulphur Springs mill to the scene of his operations and, according to the further testimony of Plue,

> "asked me to join with them in the logging operation down there and the sawmill and they would move the sawmill down there, but I would put up and operate the sawmill, and Lewis Montgomery was to operate the logging equipment."

Lewis Montgomery is the respondent. In his use of the pronouns "them" and "they" Plue referred to the Montgomerys. He testified that the respondent said that he needed $1,500 to meet the payment required on February 1, 1944, by the option agreement and that he wanted him, Plue, to advance that amount of money. In the discussion, according to Plue, he and the respondent described the logging equipment each owned and agreed that the respondent's was worth $55,000 and his, $20,000, subject to liens against his aggregating $7,000. Reed was a part owner in Plue's equipment. None of the parties had seen the other's equipment and neither of the appellants was familiar with any of the aforementioned timberlands. Plue also swore that he and the respondent agreed that he was to set up and manage the sawmill, which was then located at Sulphur Springs, after the respondent had moved it to a new site, and the respondent was to continue to manage the logging operations. What function, if any, Reed was

to perform was left unmentioned in Plue's testimony. Although the purported partnership contract undertakes to associate the appellants and the respondent together, and says that they are "to carry on business" and that "each of the parties has an interest in the business," we nowhere have any intimation as to the part Reed was to play "in the business." Since Reed was not present during the conversation and had not seen the respondent, Montgomery, Sr., or the purported contract before the trial, he, of course, could give no testimony concerning the alleged agreement. From the above point on Plue's testimony contradicts itself in important details. In response to some questions, he swore that he was not expected to secure money with which to meet the payment upon the timberland which became due April 1, 1944, and explained: "Mr. Montgomery, Sr., was to raise that. I never agreed to finance that." He also claimed that the financing of the timber was to be effected by a loan which the respondent would obtain from the Reconstruction Finance Corporation; for instance, he testified:

> "They said they had a loan in or application in to the RFC in Seattle to borrow, I think it was sixty thousand dollars, and he had already made up the statement.
>
> \* \* \*
>
> "I was told distinctly that I was to have nothing to do with raising and financing of the timber, but after they had financed the timber and moved that mill down there, then I was to take care of the rest of it and get these men and give them a job."

Referring to the respondent, he swore:

> "He gave me distinctly to understand that I didn't have anything to do with financing, that he would attend to that, that that loan was with the

Government in Seattle. * * * We talked about building a sawmill, but I didn't agree to finance the company or raise the money.

* * *

"If he had moved the mill down there I would have proceeded to get my men and build it and operate it, just exactly what I told him I would do. * * * he had this mill and he had money enough to move it down."

The following is also taken from Plue's testimony:

"Q. Now, referring to your conversations with Mr. Montgomery, Jr., isn't it a fact that your conversations were with respect to raising the finances and building this sawmill?

"A. Absolutely not.

"Q. Do you mean you and Mr. Montgomery never talked about this building of a sawmill on a co-operative basis?

"A. We talked about building a sawmill but I didn't agree to finance the company or raise the money.

"Q. What did you agree to?

"A. I agreed to build a sawmill and operate the sawmill.

* * *

"The Court: And you claim you had no part, or were to have no part in the raising of the twenty-five thousand dollars?

"A. No, I never was allowed to do that. I would have raised it and had plenty of chances to raise it.

"The Court: What I am getting at, what do you claim was your understanding and agreement in the first instance in that regard?

"A. I never had any agreement about raising money to pay for the timber. They wouldn't let me do that."

The foregoing testimony makes it manifest, we believe, that Plue claimed that, apart from contributing $1,500 to defray the payment upon the option due February 1, 1944, he was to have nothing to do with financing the venture. His part, so this evidence plainly indicates, was to set up the mill after the respondent had moved it to its new site and then manage its operation. He described himself as a lumber manufacturer and disclaimed being a financier. Yet other testimony given by him indicates that his part in the venture included a duty to obtain a sum, $50,000 or more, with which to finance operations. In the first place, the complaint alleges:

> "Plaintiffs and defendant entered into an agreement and promised and agreed to and with each other to combine their joint efforts, properties and means in purchasing certain valuable tracts of timber and to cut and log the same * * * ."

We again quote from Plue:

> "Q. What steps, if any, were taken about raising the money to pay off Porter Brothers and Tide Water Mill Company after the signing of Plaintiffs' Exhibit C on January 31st, 1944?

> "A. Well, I thought they wanted—I figured they wanted me to go out and raise the money to pay the twenty-five thousand when it come due. So I went down and saw Sam Malarkey. I had known him for years, and Dan Malarkey, his brother, had been my attorney for thirty years, and I knew I could depend on them. And they said they would be glad to take the peeler logs and finance the operation.

> "Q. Did you tell Mr. Montgomery, Jr., about this?

> "A. Well, yes, sure, when I got back I told him I could finance it through the Malarkeys, the M & M

Woodworking Company, they would advance us fifty thousand dollars, giving us twenty-five thousand dollars and twenty-five thousand dollars to work on. He said he wouldn't have nothing to do with it. He said, 'I went and talked with them about a year ago and talked with them about financing, * * *'."

Other parts of Plue's testimony render it evident that he worked out another plan for financing the venture; that is, through the medium of a co-operative ownership. In an effort to organize his co-operative concern he mailed a mimeographed letter to sawmill employees with whose names he was familiar in which he described the prospective mill and mentioned the long connection he, Reed and the respondent had had with the logging and lumber industries. The letter bestowed the name of Siuslaw Forest Products, Ltd., upon the new concern and said that men were needed at once "to start moving our mill and logging equipment from Sulphur Springs, Oregon, to our new site." It stated: "$1000 is all we have allotted to an employee * * * your profit on $1000 will amount to about as much as your salary." It commented upon the desirable features of co-operative ownership and the attractive price at which the Siuslaw Forest Products, Ltd., would be able to purchase logs. Concerning this letter, Plue testified:

"I went down and worked at the office until ten o'clock sending out letters to men that I hoped to work with me in the mill."

The following is also taken from his testimony:

"Q. Now, when Mr. Montgomery contacted you later, it was on the basis of you organizing a co-operative mill association, wasn't it?

"A. Yes, but I told him directly that I wouldn't

take any money from any of the men until I was able to give them a job.

\* \* \*

"Q. You were to build a mill near the timber, is that correct?

"A. Yes.

"Q. And what had you figured the approximate amount of money that you would be required to raise from these employees to build the mill and pay the payments due the Tide Water Mill Company?

"A. I figured we ought to have fifty thousand dollars.

"Q. Did you know when the twenty-five thousand payment was due to Porter Brothers and Tide Water Mill Company?

"A. Yes, sir.

"Q. And what date was that?

"A. That was the first of April.

\* \* \*

"Q. Isn't it a fact that the reason you were getting into this deal was because you were in a position to raise the money?

"A. To raise enough to build the mill, yes."

The appellants do not contend that the purported agreement was written the evening to which we have been referring, but argue that its terms were worked out that night. Although not all of the testimony which we have quoted consists of words which were in that conversation, all of it relates to the terms of the agreement which the appellants say were effected upon that occasion.

Based upon the conversation of January, 1944, Plue swore: "We arrived at everything, got it lined up." Then, referring to the respondent, he added: "He said he had to go back home and would be down in a

few days, and in the meantime his father could attend to whatever was necessary.'' The respondent's home was at the scene of his logging operations. As Plue concedes, no writing was prepared that evening, but a few days later, according to him, the respondent's father took him to the office of an attorney and there the paper, which is quoted in the second paragraph of this opinion, was written. Before the visit was made to the attorney's office Plue had not seen the respondent's timber or logging equipment.

The only persons present when the paper was prepared and signed were the attorney, Plue and Montgomery, Sr. Before the visit to the attorney's office was concluded the writing was drafted and executed. Montgomery, Sr., signed for his son. Plue signed, not only for himself, but also for Reed. After the paper was executed Plue handed to the respondent's father a check in the sum of $1,500 payable to him. As a witness, Plue made no effort to testify as to whether or not Montgomery, Sr., had authority to sign his son's name to the paper. In the manner just indicated, the paper which underlies this suit was drafted and signed. Montgomery, Sr., after receiving Plue's check sent one of his own to his son. According to the respondent he sent to the Porter Brothers and Tide Water companies his own check for $1,500 two or three days before he received his father's check.

The complaint, it will be recalled, charges that the writing which we have quoted made Plue and Reed partners with the Respondent. We again quote from Plue:

"Q. And you had no interest in his own private timber, did you, other than a right to buy it and pay for it?

"A. That was the understanding, that we would get a contract for that timber the same as we would get for the Porter Brothers and then all that timber would belong to the mill operation.

"Q. By that contract it would go to the Siuslaw Co-operative, Ltd.?

"A. It belonged to the partnership. The other was never completed and this partnership was completed."

To render that testimony fully understandable, we remind ourselves that Siuslaw Co-operative, Ltd., was the name chosen for the contemplated co-operative association which Plue sought to organize. Had it been formed it would have been owned, we assume, by the men who worked in the mill. The purported partnership, upon the other hand, if it exists, consists of the respondent and the two appellants.

Plue also testified:

"Q. Then you weren't claiming any interest and you don't now claim any interest in any timber holdings of Mr. Montgomery?

"A. Absolutely I do, all the timber and all the holdings he had was to go in with the mill.

*   *   *

"Q. Do you mean you were a partner with Mr. Montgomery in his own timber?

"A. I was a partner of Mr. Montgomery in his logging equipment and whatever holdings he had, because we would get the timber and saw it up in that mill."

At one time Plue prepared a typewritten statement showing the assets and liabilities of his contemplated co-operative concern, which he then termed "Montgomery Log & Lumber, Ltd." After that name he wrote the words, "A Co-op." and followed that de-

scriptive phrase with "A Trust in Joint Tenancy." The first entry which he made under the heading of Assets follows: "A contract for 20 million feet of timber at $3.00 per M."; the second was "A contract for 100 million feet of timber at $2.50 per M." Thus, he entered as assets of the "co-op"—not of the partnership—the respondent's valuable 20 million feet of timber and also the desirable option which the respondent had to purchase the additional 100 million feet. According to all of the evidence, the co-operative concern which Plue sought to organize would be owned by all employees who contributed $1,000 each. We have already quoted from Plue's testimony in which he swore that the respondent's timber and the option "belonged to the partnership" and "I was a partner of Mr. Montgomery in * * * whatever holdings he had." Thus, we see that he at one time imputed an interest in the respondent's valuable timber to the partnership and at another time to the co-operative. It is impossible to discern from his testimony what sort of entity he thought the co-operative would be. Concerning it he employed such terms as "a board of five trustees," "a trust officer," "limited liabilities," "a vice chairman" and "a trust in joint tenancy."

Although Reed had not seen the alleged contract until the day of the trial, he swore that Plue had authority to sign it on his behalf. We quote the following from his testimony:

"Q. In other words, you don't know much about anything that is concerned in this case, do you?
"A. That's right."

He freely conceded that he had not seen either the respondent or his father prior to the day of the trial. For instance:

"Q. You have never conferred with either of the Mr. Montgomerys?

"A. No, this is the first time I have ever seen the gentlemen.

\* \* \*

"Q. And you never had any agreement with Mr. Montgomery, the defendant?

"A. No, I never did."

He made no effort whatever to say what part he was expected to play in the alleged partnership, joint enterprise or co-operative. It is agreed that the above-quoted paper is the only written evidence of the purported partnership contract. No other paper bears the signatures of the parties.

We revert to the last paragraph of the alleged partnership agreement, which says:

"It is understood that this is a temporary agreement, further details to be included in a more particular agreement to be later drawn up between the parties."

We think it is evident that many important phases of the contemplated relationship were left unmentioned in the discussion and in the writing. The alleged partnership proposed to engage in extensive operations involving the expenditure of large sums for payrolls, equipment and timber purchases. Moreover, the methods of operation, according to Plue's version of them, would be complex. For instance, the paper he depends upon seeks to create a partnership between the respondent as "first party" and another unit consisting of himself and Reed as "second party." If the appellants are not a partnership or a joint enterprise, we are at a loss to know the nature of their association. To this complex structure it was proposed to add,

according to the appellants, a co-operative association to be owned, somehow, by fifty or so woodworkers who would contribute $1,000 each. The mill which it was proposed to use was owned, not by the alleged partnership or co-operative, but by the respondent and an associate of his. We think that even the most versatile of lawyers would have to consume many hours with his clients and submit for their consideration many drafts of agreements in efforts to write a workable agreement between these several groups of conflicting interests. The groups themselves, in all likelihood, would have to make many revisions in their plans before the attorney could succeed in bringing them to agreement.

■ We believe that the contradictory testimony which Plue gave concerning his part in financing the venture was not due to a lack of probity on his part, but to the fact that the respondent and he had not discussed the subject of financing sufficiently to afford either of them a clear conception of what was to be done. Discussions, no matter how adequate, do not necessarily produce contractual relationships, but normally no contractual relationship is brought about as the result of discussion unless it is carried on to such an extent that the minds of the parties meet upon all of the essential terms of the proposed venture.

The appellants' brief, referring to the signing of the alleged contract, says: "Obviously, thereafter there remained many details to be worked out." The following testimony, given by Plue, which shows still further the incompleteness of the bargaining, does not refer to mere details:

"Q. You say you were going to build it as soon as he moved the mill down. Was there an under-

standing there between you as to when the mill would be moved down?

"A. No exact understanding, only he said he had men and he could move it himself.

"Q. That was to be moved on to Porter Brothers and Tide Water Mill Company land, is that correct?

"A. I don't know about that. No, I think it was on some land that was his, but I couldn't say as to that. I don't know exactly what land it was on. All I know is where it laid and situated as to the water and the timber.

"Q. Did you anticipate moving the mill and building the mill prior to the payment of the twenty-five thousand dollars in the Porter Brothers and Tidewater contract?

"A. Well, the mill belonged to Montgomery, Jr., and Peters. It wasn't for me to say when he was going to move it.

"Q. Well, was the co-op going to buy this mill from Peters and Montgomery?

"A. Well, I don't know whether you would consider it buying it or not. What they wanted to do was to put up the mill and run it on this co-op proposition."

We have already adverted to another phase of the contemplated relationship which remained unmentioned in the conversation of January, 1944; that is, the part which Reed was to play in the alleged partnership. If it was contemplated that he was to become a partner, a joint adventurer, or the master mechanic for the mill, that fact was not disclosed by any witness who testified. Although the complaint uses the terms "partnership" and "joint adventure", the alleged agreement employs neither of those terms. It groups the appellants together as the "second party" and says that "each of the parties", that is, the first party and

the second party, "has an interest in the business in proportion to the values herein set forth." Unless it was proposed to create a partnership within a partnership, we do not know what was intended by the draftsman of the instrument. But, since Plue did not suggest that Reed be permitted to join the venture, we are certain that the minds of Plue and the respondent never met upon Reed. It will be recalled that the respondent did not sign the alleged agreement, and that no one swore that Montgomery, Sr., had authority to sign his son's name.

We shall now mention still another phase of the contemplated relationship concerning which the discussion failed to yield a meeting of the minds.

If a co-operative association were organized, its relationship to the partnership would be highly important to the latter. Obviously, the respondent was not interested in the formation of a partnership and the construction of a sawmill unless he or the partnership controlled the operation of the mill. His sole interest in having a sawmill built was to afford him an opportunity to manufacture his logs into lumber. Plue, as a witness, gave no intimation as to the manner in which the relationship between the alleged partnership and the contemplated co-operative mill was to be worked out.

Another element of the contemplated contract, which presumably would be important, was the respondent's 20 million feet of timber and his possession of the option for an additional 100 million feet. If the respondent continued to own both of those assets and could handle them in any way he chose, the appellants' interest in the partnership would be of doubtful value, and the workingmen's interest in the co-operative

might be of no value whatever. Control by the partnership or the co-operative mill over those two items appears to have been an essential element of the alleged agreement. The purported written partnership agreement mentions the option but not the respondent's timberland. It says that the respective interests of the first party and of the second party "in the business" shall be "in proportion to the values herein set forth"; that is, in the proportion of $55,000 (value of the respondent's equipment) to $13,250 (value of appellants' equipment, plus $1,500). Although the paper mentions the option and requires that the $1,500 contributed by the appellants should be paid for its extension, it otherwise is silent concerning the option agreement. As a witness, Plue did not claim that anything was said in the course of the evening's conversation indicating that he, Reed, the partnership or the co-operative was to have a share in the respondent's timber or in the option. It will be recalled, however, that while testifying he claimed an interest in both, and that when he was attempting to organize the co-operative mill he prepared a statement in which he listed both as assets of the co-operative.

■ Since Plue was not a logger, membership in the purported firm would have been of no consequence to him unless the firm secured in some form the respondent's timber and his option. If the purported partnership agreement made the firm the owner of both the respondent's timberland and the option, then, although the respondent's contribution to the firm's assets would be greatly in excess of $55,000 (value of his logging equipment), his proportional interest in the business would be only in the ratio of $55,000 to $13,250. Thus, he would get nothing for these two valuable

assets. If the anticipated co-operative concern, owned as it would be by its employees, was to have the respondent's timber and his option, what was the respondent to receive for parting with these valuable items? And if the respondent transferred these assets to the co-operative mill, what purpose would he or the appellants have to remain members of the alleged partnership? The mere mention of these problems and the inability to find in the evidence an answer to them indicate that the purported agreement is incomplete and that the parties evidently deferred to a later time a meeting of their minds; in fact, some of the problems could not have been settled in the discussion which took place in January of 1944 because at that time the parties could not know what turn the financing efforts would take. It is obvious from the very terms of the paper upon which the appellants rely that the purported contract was incomplete, for it says: " * * * a more particular agreement to be later drawn up between the parties." We add what must be obvious— the evidence gives no hint as to what would be put into the future writing in the event one was prepared.

We shall review the evidence no further. The circuit court rejected the appellants' and accepted the respondent's version of what occurred in the January, 1944, meeting. That is evident not only from the findings of fact, but also from the court's memorandum opinion, which states:

"I am thoroughly convinced that Plaintiffs' Exhibit A does not constitute a completed contract, and does not and did not constitute a meeting of the minds of the Plaintiffs and the Defendant in the transaction. * * * I am convinced that Exhibit A was nothing more than an expression of a desire and a preliminary agreement to enter into a later

contract, that the terms of the later contract were never agreed to by all parties. I believe that the financing was to be done by the Plaintiffs and that this was not completed after reasonable notification. I find no substantiation of the charge of fraud or of cheating on the part of the Defendant."

It is agreed that the respondent, upon becoming satisfied that Plue could not succeed in financing a mill, tendered back to him the sum of $1,500 which he paid to Montgomery, Sr., concurrently with the signing of the alleged contract.

Although our review of the evidence has in many instances departed far from the alleged written partnership agreement, it will be recalled from our review of the pleadings that the complaint is based upon that writing. Bearing in mind that fact, let us go to the authorities for the controlling principle of law.

■ According to Williston on Contracts, Rev. Ed., § 45:

"Although a promise may be sufficiently definite when it contains an option given to the promisor or promisee, yet if an essential element is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. Since either party by the very terms of the promise may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise."

From 12 Am. Jur., Contracts, § 23, p. 519, we quote:

"A contract is not made so long as, in the contemplation of both parties thereto, something remains to be done to establish contract relations. * * * A binding contract is not made by a memo-

randum which shows upon its face that the minds of the parties have not met and that it does not express a completed agreement, but states terms which, if accepted, would be the foundation of further treaty between the parties with reference to essential particulars which, when agreed upon, would form part of a contract.''

Continuing, § 24 of the same treatise says:

"Unless an agreement to make a future contract is definite and certain upon all the subjects to be embraced, however, it is nugatory. An agreement that they will in the future make such contract as they may then agree upon amounts to nothing. To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations.''

■ According to 17 C. J. S., Contracts, § 31, p. 359:

"In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference. Until all understand alike, there can be no assent, and, therefore, no contract. Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode is agreed on by which it may be settled, there is no agreement, * * * .''

■ The same volume, in § 49, at p. 394, says:

"Unless all the terms and conditions are agreed on, and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect, as in case of a contract to enter into a contract on terms to be settled at some future time.''

■ Restatement of the Law, Contracts, § 32, states:

"An offer must be so definite in its terms, or re-

quire such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain."

The tenth illustration given by the section follows:

"A promises B to do a specified piece of work and B promises A to pay a price to be thereafter mutually agreed. As the only method of settling the price is dependent on future agreement of the parties, and as either party may refuse to agree, there is no contract. * * * "

We do not understand that the appellants question the principle of law stated by the above authorities in the words which we have just quoted. That principle was employed in *Holtz v. Olds,* 84 Or. 567, 164 P. 583, 164 P. 1184; *Gregory v. Oregon Fruit Juice Co.,* 84 Or. 199, 164 P. 728; and *Newport Construction Co. v. Porter,* 118 Or. 127, 246 P. 211. The particulars of the relationship upon which the parties failed to agree were not mere details, and no stipulation to which they are parties provides a formula by which the incomplete terms may be supplied. This case, therefore, is not within the exception recognized in *Union States Life Ins. Co. v. Bernert,* 161 Or. 44, 87 P. (2d) 744.

■ We said in a preceding paragraph that the appellants' brief takes for granted that the purported agreement is a valid, enforceable contract which created between the parties the relationship of joint adventurers. Their brief adds:

"A joint adventure must of necessity relate to acts to be performed in the future. Illustrative of this contention is San Francisco Iron & Metal Co. v. American Milling & Industrial Co., 115 Cal. App. 238, 1 P. (2d) 1008."

We are satisfied that it is unnecessary in a partnership agreement to specify the mode in which immaterial particulars, which may present themselves in the future, shall be handled. For example, if men enter into a partnership agreement for the manufacture of lumber, failure to specify the manner in which their lumber shall be marketed, or the bookkeeping methods to be pursued, very likely will not deprive the agreement of validity. We have read the San Francisco Iron & Metal Company decision, but have found nothing in it adverse to the principle stated by the foregoing authorities. The fact that the particulars of the alleged relationship, concerning which no meeting of the minds occurred, were material is shown by the fact that the relief which the appellants seek can not be granted unless we supply for the parties missing parts of their agreement. For instance, the appellants seek an accounting ''for the value of plaintiffs' interest in said timber * * * and the profits derived therefrom.'' In a previous paragraph we stated our opinion that the minds of the parties never met upon the question as to what disposition should be made of the respondent's 20 million feet of timber and of his option for the purchase of 100 million feet more. We can not fill out the agreement for the parties, and yet unless there is inserted in it a covenant favorable to the appellants concerning the timber, they are entitled to no relief. It necessarily follows that the agreement is incomplete, and, therefore, unenforceable. Lest we be misunderstood upon another phase of the controversy, we repeat what we hope we have already made clear: the discussions did not go far enough to bring the parties into an agreement to become partners or joint adventurers.

Two insurmountable difficulties, therefore, con-

front the appellants: (1) the parties, as the circuit court's findings point out, did not intend in any of their discussions to effect a contractual relationship, although Plue and the respondent looked forward to entering into some sort of agreement in the event that Plue could procure the needed sums of money; and (2) if the writing upon which this suit is predicated could be deemed a contract, it is incomplete. We do not hold that it is essential to the consummation of a contract that the parties intend to contract, but deem the expression of an assent as indispensable to the formation of an agreement. None of the parties, in our opinion, assented to the consummation of a contractual relationship.

It follows from the above that the decree of the circuit court must be affirmed.