Argued October 1, affirmed November 13, petition for rehearing
denied December 10, 1958

## CARSON Admx. *v.* McMAHAN Admr.

332 P. 2d 84

*Joseph M. Devers* and *Edward L. Clark, Jr.*, Salem, argued the cause and filed a brief for appellant.

*W. C. Winslow*, Salem, argued the cause and filed a brief for respondent.

Before PERRY, Chief Justice, and WARNER, SLOAN and O'CONNELL, Justices.

SLOAN, J.

The plaintiff, Myrtle A. Carson, filed her complaint herein against the late L. H. McMahan seeking a declaratory judgment. She makes these allegations: That her deceased husband, John H. Carson, had been an attorney at law; prior to his death he had participated as an attorney jointly with L. H. McMahan in the trial and appeal of the case of *Putnam v. Jenkins*, 204 Or 691, 285 P2d 532, as a result of which a substantial at-

torneys' fee had been earned by the efforts of her deceased husband and L. H. McMahan; that the efforts of her deceased husband had been instrumental in the successful determination of the Putnam case in favor of the clients of said attorneys; that she did not know of the nature of the agreement, if any, existing between said attorneys and between the attorneys and the client in respect to the fee to be paid and how it was to be divided; that a controversy had developed between herself and L. H. McMahan "regarding said matter of attorneys' fees, said L. H. McMahan asserting and contending that the said John H. Carson has been fully paid for all of his services so rendered * * *"; that it was necessary for the court to declare the rights of the parties to the fee and that plaintiff's share should be imposed as a lien on the decree entered in the Putnam case as well as upon the property rights fixed by the decree. The defendant, McMahan, answered and denied that any portion of the fee was owing to Carson, or his estate. He affirmatively alleged he had paid Carson in full for all services rendered. In order better to understand the issues involved in the instant case we believe a resume of the facts culminating in this dispute is necessary.

The reported opinion in the Putnam case fully discloses the issues and parties to that proceeding. No further discussion thereof is necessary. McMahan first filed an answer in behalf of one of the defendants named in the original complaint. He subsequently filed a complaint in intervention in behalf of a party named Pettingill. It was upon this complaint in intervention that the proceeding was determined in the trial court and on appeal. It was in its support that McMahan engaged Carson.

At the time that McMahan entered the case he was

afflicted with the infirmities of advanced age and with physical handicaps growing out of an automobile accident he had suffered. The record is clear that he was aware that he could not handle litigation of this complexity. He was aware that he required a lawyer of sound ability and experience to assume the onerous task of the preparation and trial of the case and to share in, if not assume, the heavy responsibility that attends every lawyer in asserting and protecting the rights of his client in litigation. He engaged the services of plaintiff's intestate, John Carson. The latter was a highly capable and experienced lawyer of Salem. He was a long-time personal friend of Judge McMahan. From thence forward Mr. Carson carried the bulk of the burden of the case which culminated successfully for the clients of Judge McMahan and Carson.

In June of 1950 Judge McMahan had entered into written contract with his clients, the Pettingill family, by which he was to receive for his fee 50 per cent of any property, or its proceeds, derived from the litigation. When the case was concluded this 50 per cent was equal to about $75,000. However, before the fee could be realized and its division made by Carson and McMahan, John Carson died. When the plaintiff, as his widow and personal representative, approached McMahan for Carson's share of the fee McMahan asserted he had already paid Carson in full by the means now to be described.

During the years that the case was in process, beginning December 14, 1950, and extending to June 7, 1955, McMahan had made and delivered checks payable to Carson in the total sum of $715. The checks were in denominations of $25 to $100. He also contended he had given Carson cash in addition to the checks; that the total amount paid Carson, cash and checks,

was about $1,000. Following Carson's death McMahan claimed he had "hired" Carson as an employe and had paid him in full by these checks and cash. McMahan died shortly before the trial of this case but his testimony had been perpetuated by a deposition taken earlier. In the deposition McMahan testified that he had paid Carson this money for services rendered by Carson at the various stages of preparation, trial and appeal; that Carson had been paid in full.

Defendant asserts that this is persuasive evidence that an agreement existed between Carson and McMahan, by the terms of which Carson was to be paid only for each service rendered and that the checks, therefore, constituted payment in full. It is the plaintiff's contention that these payments were only advances and that there was no specific agreement between Carson and McMahan.

■ The parties agree to the general rule that if there be a complete absence of a specific agreement as to the division of a contingent fee between attorneys associated in the prosecution of a case, the fee is to be divided equally. *Bailey v. Griggs*, 174 Okla 90, 49 P2d 695; *Underwood v. Overstreet*, 188 Ky 562, 223 SW 152, 10 ALR 1357; *Brauns v. Housden*, 195 Wash 140, 79 P2d 981. The trial court found an absence of agreement and, accordingly, awarded an even division of the fee. The assignments of error in defendant's brief are three in number. However, the actual, and only, question to be determined is thus expressed by defendant's brief; "It is the contention of defendants there, and appellants here, that John Carson was *hired*, and the evidence shows that he was paid attorney's fees for the work performed by him during the prosecution of the Pettingill suit." (Italics theirs.)

■■ We do take specific notice of defendant's first

assignment, for by it he challenges the sufficiency of the complaint. We find no merit in this contention. It alleged a "* * * failure on the part of defendant to discharge some positive legal duty with respect to some right of plaintiff. * * *. * * * [a] complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to legal rights and duties of respective parties * * *." 1 Anderson, Declaratory Judgments (2d ed) 588, § 253. In addition the parties stipulated the issues to be presented to and determined by the trial court. The court heard and determined the facts in accordance with the contentions of the parties as outlined by their respective counsel at the beginning of the trial "* * * where an action for a declaratory judgment is submitted upon a stipulation that completely covers the case, then the matter of pleadings becomes immaterial * * *." 1 Anderson, Declaratory Judgments (2d ed) 706, § 304.

█ The remaining assignments go to defendant's contention that the trial court erred in finding no agreement existed. We think it only necessary to state that the evidence is not sufficient to establish an "agreement." Although McMahan may have intended that there be such an agreement and wrote checks to Carson pursuant to such intention, this does not establish Carson ever gave expression, express or implied, of that assent which is "indispensable to the formation of an agreement." *Reed v. Montgomery*, 180 Or 196, 223, 175 P2d 986. Neither McMahan's testimony nor the other evidence is sufficient to meet this test. There is no believable evidence that Carson acknowledged full payment or manifested any such intent or assent. Restatement, Contracts 25, § 20. "In the absence of a more specific agreement between them, the law im-

plied an equal division of such fee." *Gill v. Mayne* (Iowa), 162 NW 24, 26.

■ One other factor is very persuasive to our determination. As herein indicated, defendant has contended from the outset that Carson had been paid in full in accordance with an agreement that Carson had recognized. This is repeated in pleadings, trial and brief. However, at the conclusion of the trial of this case the defendant submitted proposed findings of fact. Finding No. V proposed that in addition to the sum alleged to have been paid to Carson in full satisfaction, he should be awarded an additional sum of $10,000 "to compensate him for favorable results obtained in litigation while *associated* with L. H. McMahan." (Italics ours.) We take this proposed finding as a judicial admission that Carson was something more than a "hired" hand and that he had not been paid in full. McCormick on Evidence 520, § 244; *Archambeau v. Edmunson*, 87 Or 476-83, 171 P 186.

We believe further discussion to be unwarranted. A detailed delineation of further facts would be of interest only to the parties involved. We have given careful attention to the entire record and the briefs. The trial judge heard and decided this case with meticulous and sensitive care. We agree with his findings and concur with the opinion he rendered supporting them. We believe the ends of justice would best be served by limiting this opinion to that conclusion. We affirm the trial court's decree and award costs to neither party.

O'CONNELL, J., dissenting.

It is well established that if two or more lawyers jointly undertake to represent a client the fee is shared equally in the absence of an agreement to the contrary. The law implies an agreement for an equal division

of the fee. The presumption of an equal sharing may be overcome by evidence showing a contrary intent. We must determine whether the plaintiff, aided by this presumption, has carried his burden of proof. I am of the opinion that he has not done so in this case. Much of the testimony is in direct conflict. Most of it comes from witnesses who are either directly or indirectly interested in the outcome of the case. There is no doubt that John Carson performed substantial legal services in connection with the litigation which produced the fee in question. These services could have been rendered either as a joint adventurer with L. H. McMahan or as one employed to perform legal services for another. In the ordinary case, when two lawyers are engaged in the prosecution of a law suit, they usually share the fee equally. The presumption alluded to above gives recognition to this customary practice and effects an equal division of the fee unless there is sufficient evidence to show that the parties intended some other division of the fee or method of compensation. But it is not uncommon for one lawyer to employ another lawyer under an agreement calling for the payment of a fee based upon a per-hour or per-diem basis. And occasionally it is agreed that payment shall be made upon the basis of the reasonable value of the services, the final determination of the compensation being postponed until the case is concluded.

The arrangement entered into between Carson and McMahan in the present case was not the usual one referred to above. At the time Carson was brought into the case McMahan had already performed for his client, Katherine Pettingill, legal services in the lawsuit which yielded the fee, these services including the filing of a complaint in intervention and a reply to

the answer to that complaint. More important than this, however, was the fact that McMahan paid to Carson from time to time during the course of the litigation various sums of money, totalling at least $834.00, as legal fees. It should be noted also that in the early stages of the lawsuit the prospective fee would be approximately $7,500. It was also established that McMahan paid the expenses of litigation amounting to $552.20. Although the expert witnesses (two former presidents of the Oregon State Bar) called by the plaintiff testified that it was not uncommon for one attorney to advance the *expenses* of litigation in a joint adventure, they stated that the payment of *fees* by one attorney to another attorney in the manner McMahan paid Carson would be a most unusual procedure for persons engaged in a joint adventure.

The evidence introduced in support of Carson's claim may be summarized as follows: Myrtle Carson, John Carson's widow, testified that he had worked many hours on the Pettingill case; that the case seemed very important to him; that he had described it as the biggest case he had ever had; that he expected it would be the largest fee that he had ever had out of a lawsuit; that he discussed the case over the telephone with McMahan quite often; that he made several trips to Roseburg concerning the case; that Carson told her that "there would be enough out of this case to take care of" her; that after the case was argued before the Oregon Supreme Court he called the clerk from time to time to find out what decision was reached by the Court; that after that decision was rendered he held a conference with McMahan and that before leaving for that conference he told his wife that he was going to discuss the fee with McMahan; that McMahan had called her on numerous occasions attempting to

get her to drop the case against him. Carson's brothers, with whom he shared law offices, testified that Mc-Mahan was frequently in Carson's office; that Mc-Mahan had said, "Johnny and I are going to get a god damn good fee out of this case"; that after the decision in that case was rendered by this Court Carson asked one of his brothers what a reasonable division of the fee should be, indicating that he felt that fifty per cent would be reasonable; that Carson had said on one occasion that he expected a fee in excess of $30,000. One of Carson's brothers also testified that McMahan had made a threat that if Mrs. Carson did not drop the lawsuit that he would be obliged to divulge matters which would be injurious to the Carson family. It is undisputed that Carson was unassisted in the trial of the case, which lasted one day, and that he argued the case on appeal. Although there was a conflict of testimony as to the relative amount of work McMahan and Carson contributed in the preparation for trial and in the preparation of the brief, it seems clear that Carson did a substantial amount of the work.

The evidence in support of McMahan's position was as follows: As already indicated, McMahan paid Carson fees totalling the sum of $834 by several checks, and according to McMahan's testimony, an additional amount in cash, which together with the checks, would total $1,000. McMahan paid $552.20 as expenses of litigation. McMahan had performed legal services in connection with the case before Carson was called upon to assist him. McMahan had employed another attorney to help him with the case before he employed Carson. McMahan's son testified that his father was first interested in the case in 1949 or 1950; that Mc-Mahan had spent considerable time in the Oregon

Supreme Court library and in John Carson's office library working on the brief after the circuit court decision; that McMahan had made four or five trips to Roseburg in connection with the case; that after the case was decided by the Supreme Court McMahan got the file from Carson and without Carson's assistance did further work on the case, particularly in connection with the sale of the property involved in the suit; that his father had told him that Carson had been paid in full; that his father had few assets at the time he was paying the expenses of litigation and the fees to Carson; that his father worried about what he would be able to leave to his widow upon his death. McMahan's deposition was taken at a time when he was obviously ill and very probably senile. It is quite apparent that his memory was affected. He testified that because his hearing was bad he had hired Carson to try the case; he did not remember the basis upon which he hired him; that he had paid Carson $1,000 in checks and cash; that "he paid him what it was—, paid him just as if you hired any man, to pay him"; that just before Carson died McMahan went to Carson's office. McMahan's testimony concerning this visit was as follows:

"A * * * I went up to the office just to see him and he wasn't looking very well. I think that was four or five days before he took down sick and I thought that John * * * had spent his money. As he had been a playmate of my boy who died, I was interested in him more than anybody else, almost, and he was sitting across the table from me, and when I got up he was looking depressed, very much. That was on account of the sickness, really, that was coming on him. I wrote him out a check for a hundred dollars and put it over to him and he looked at it and then put it over on the other side and said, 'You don't owe me anything, Mac. You know you paid me all that you owe

me for all the work I have ever done for you.' I said, 'Never mind, John, you cash it.' And I went on out and left him. And then when he left it— he left it there, and then three or four days after that he had that sickness and after he died they found this check on the table and John's wife cashed the check, but that was after John had been buried."

McMahan testified on cross-examination that "my recollection of that is that the girls signed that other check. I think Myrtle [John Carson's widow] signed it." Further testimony concerning this episode was as follows:

"Q  That check was for a hundred dollars?
"A  Yes.

"Q  Is that the check?
"A  No.

"Q  Haven't you got the check here?
"A  Wait a moment. Well, this may be it, but I thought the girls endorsed that other check. The girls endorsed it on that, it seemed to me. I am not certain about it.

"Q  I am just wondering, is that about the right time?
"A  Well, what is this, in '55?

"Q  I think you have got it before you there.
"A  In '55 and this is what—this is '55.

"Q  That check is '55, isn't it, and this is '56 we are in. Is that the check or can you tell?
"A  I can't tell. I can't tell.

"Q  Well, would you know, if this isn't the check, have you got another check someplace?
"A  I don't know. I never keep my checks. I don't keep books even. Never did.

*  *  *  *  *

"Q  Just a minute. We don't quite understand this check here.
"A  Huh?

"Q We don't quite understand that check, whether that is the check that you talked about leaving there on the table or not.

"A Well, how could I tell; I don't know any more about it than you do, Walt.

"Q That isn't very much.

"A But I don't believe it is. I will tell you why. My recollection of that is that the girls signed that other check. I think Myrtle signed it and—

"Q Do you know why you haven't got that other check here?

"A Why I haven't got it?

"Q Yes.

"A No, I never had any of those checks. Where did you get them?

"Q Your attorney produced them here in evidence a while ago.

"A Oh, those were the ones they found down at the house.

"Q I don't know where they found them.

"A I was confused in regard to that, and I don't know anything about it.

"Q Now, you are sure, are you, that the last day you were up there you left him a check for a hundred dollars? That is just a few days—

"A That was the last time I saw him, yes. He was sick and he wouldn't take it. He looked like he was sick and I left it to him and they found it after he died. They found it where he had thrown it over here and left it on the table.

"Q How do you know how they found it?

"A Well, that is what they said, it was found that way.

"Q Somebody told you that?

"A I think Myrtle told me about it, I am not certain.

"Q And you think she cashed it? You think she cashed that check?

"A Why, yes. I think Myrtle got it. Is she here now?

"Q Yes she is back there.

"A Myrtle—

"Q Mac, they are going to take her deposition in just a little bit, then she can speak for herself rather than talking across the courtroom now. But your memory is, let's get your memory of it then she can give her memory of it, your memory of it is that this isn't the check that you gave him upon that occasion, that you gave him another one for a hundred dollars on that occasion, and that Myrtle cashed that other check?

"A Yes, that is my recollection of it, or remembrance of it, my recollection, because I had forgotten all about it, you know. But it seems to me that Myrtle's name was—she cashed it after John died."

Carson's wife and brothers testified that they had never seen the $100 check. Neither the canceled check nor the bank photostat of it was introduced into evidence. Mrs. Carson's name appears as an endorser on one of the checks which McMahan gave to Carson. It is possible that McMahan confused that check with the one he alleged was left with Carson. It is possible that his testimony with respect to the delivery of the check to Carson was entirely false.

The foregoing testimony, substantially all of which was given by persons interested in the outcome of the case, constituted the bulk of the evidence. The plaintiff introduced the deposition of the late Chief Justice EARL LATOURETTE, in which he testified that after the case was at issue in the Supreme Court McMahan called upon him as Chief Justice to advance the

Pettingill case on the docket, giving as his reason the following: "John [Carson] and I have a big fee tied up in this matter and I want to get my portion of it before I die."

A letter written by Mr. Justice ROSSMAN on October 1, 1957 addressed to counsel for plaintiff and defendant was admitted into evidence by stipulation. In this letter Mr. Justice ROSSMAN referred to a conversation which he had with McMahan "possibly two or three years" prior to October 1, 1957, in which McMahan "mentioned a case pending in the circuit court in which he was one of the attorneys and which involved some valuable timber. He told me that he had given the case attention for many years and presently added that John Carson was working with him upon the matter. I believe that he said that he (Judge McMahan) had hired Mr. Carson. I saw that he expected to receive a sizeable fee. * * *"

The only substantial testimony directly relating to the nature of the business relationship between McMahan and Carson, aside from that given by interested persons, was that of the Pettingills. It tends to support McMahan's position. Katherine Pettingill's son, who acted as his mother's agent in connection with the litigation in which she intervened, testified that he met McMahan in 1950; that McMahan stated that on account of his hearing he would be unable to try the case and he asked permission to hire another attorney; that McMahan agreed to pay all the expenses of the trial; that McMahon had remarked numerous times that he had paid John . Carson in full. Florence Pettingill, Howard's wife, testified that "at various times Judge McMahan stated that he was paying .John Carson as he went along." . She also testified that after the decision of the Supreme Court had been handed down,

Carson had asked her if there had been any written contract with McMahan with respect to attorney's fees.

Much of the evidence in support of plaintiff's case relates to the amount of work performed by Carson. The fact that Carson performed a substantial proportion of the work does not necessarily establish a partnership. A lawyer may be employed by another lawyer to do *all* of the work on a case for a stipulated fee or on the basis of the value of his services. Obviously such evidence is of prime importance if the theory of recovery is quantum meruit.

The foregoing is a fair review of the evidence. It is my opinion that the evidence adduced by the defendant was sufficient to rebut the implied agreement for an equal division of the fee although I do not feel that it was sufficient to establish the contrary proposition that McMahan had paid Carson in full and that Carson understood that he was paid in full. It is possible that Carson proceeded on the assumption that he would be paid the reasonable value of his services, whereas McMahan assumed that he was paying Carson as he went along. It is also possible that both parties understood that Carson would be paid the reasonable value of his services when the case was concluded, taking into account the fees already paid by McMahan. Whichever way it is viewed the evidence does not appear to point to an equal division of the fee with sufficient force to satisfy the burden of proof cast upon the plaintiff. That being so, I think that the case should be remanded to the trial court for the purpose of establishing the reasonable value of the legal services rendered by Carson. The trial judge stated that if this court should decide that an agreement for an equal division was not established he would find that the division would be equal on a quantum meruit basis.

But there was not sufficient evidence introduced from which it could be determined that John Carson's services were worth approximately $40,000. The value of Carson's services should be proved. The majority of the court treats the defendant's proposed finding No. V that Carson be paid an additional $10,000 for his services as a "judicial admission that Carson was something more than a 'hired' hand and that he had not been paid in full." I do not so regard it. Counsel for the defendant submitted this finding after the court had rejected defendant's contention that Carson had been paid in full. The proposed finding, if an admission of anything, was merely the recognition that at most Carson was entitled to recover on a quantum meruit basis. In my opinion that is the conclusion which this court should reach, and the case should be remanded to determine the reasonable value of John Carson's services.