Argued November 17, 1954, affirmed June 29, 1955

PUTNAM ET UX. *v.* JENKINS ET UX.

285 P. 2d 532

*James C. Dezendorf* argued the cause for appellants George W. Putnam and Gladys Putnam.

*John H. Carson,* Salem, argued the cause for respondents.

Before LATOURETTE*, Chief Justice, and WARNER**, ROSSMAN, LUSK, BRAND, TOOZE and PERRY, Justices.

WARNER, C.J.

This suit was begun for the purpose of quieting the title of the plaintiffs George W. Putnam and Gladys Putnam, brother and sister, who claim to be the owners of the following described real property:

> "The north half of the southwest quarter, and the southwest quarter of the southwest quarter, and the northwest quarter of the southeast quarter, all in section 20, township 24 south, range 1 west of the Willamette Meridian, Douglas County, State of Oregon."

The foregoing is a description of the same parcel described in the inventory filed in the matter of the probate of Mrs. Lilla G. Putnam's estate, instituted in Douglas county in August 1947. For convenience we will hereinafter refer to it as the "inventory description". The inventory also included the northwest quarter of said section 20 in which we have no interest and which we assume to have been the homestead entry of Mrs. Putnam occasionally referred to as having been adjacent to the timber entry of John F. Pettingill,

---

* Chief Justice when this case was argued.
** Chief Justice when this decision was rendered.

now deceased, and husband of the intervenor, Katherine A. Pettingill.

The suit was initially brought against the heirs of Irvena Jenkins, deceased (a sister of Lilla G. Putnam), as claimants of interests adverse to the title of the plaintiffs Putnam. Thereafter, Katherine Pettingill, the respondent, filed her complaint in intervention in which she prayed that said real property be sold and the proceeds from said sale distributed as directed in the will of her sister Lilla. We will later give particular attention to this provision.

Prior to 1913 the property above described was owned by the said John F. Pettingill. It was mortgaged that year by Mr. and Mrs. Pettingill to secure a loan made to them by L. A. Moore. In 1914 this mortgage was satisfied of record by Moore after receiving a warranty deed to the land from the Pettingills. In February 1915 Lilla Putnam, a sister of Katherine Pettingill and the stepmother of the appellants George and Gladys Putnam, paid Moore $400 for the above described property. Moore thereupon conveyed it by warranty deed to Mrs. Putnam, who thereafter held title until she died in 1933.

From a decree dismissing the complaint of the plaintiffs and directing a sale of the real property and a distribution of the proceeds in accordance with the directions of Lilla Putnam's will, the plaintiffs George and Gladys Putnam appeal.

The Monarch Door & Manufacturing Co. was another plaintiff in intervention but shortly after the initiation of this appeal withdrew as an appellant. Its interest is, therefore, no longer a matter for our inquiry.

This appeal presents no issue of fact. We have only to treat here with issues of law which are presented by undisputed facts. However, before we pro-

ceed further it is necessary to have a fuller understanding of these facts whence the legal issues are derived.

Mrs. Pettingill's sister Lilla died in Minneapolis, Minnesota, on June 14, 1933. Prior to that date, on June 18, 1927, she had executed her last will and testament wherein she devised and bequeathed all her real and personal property to her husband George H. Putnam (father of the appellants) in language as follows:

"All my property * * * with the exception of the following property:—

"The North half of the South West Quarter (N ½SW¼) and North West of the South East Quarter (NW ¼ SE ¼) and South West of the South West Quarter (SW ¼ SW ¼) of Section twenty (20) Township twenty four (24) Range One (1) West. When this is sold, the proceeds over and above the indebtedness to us shall be paid to my sister Katherine A. Pettingill. And of the indebtedness accruing to us from this property I will and bequeath five hundred dollars to my daughter Dorothy and the same amount to my sister Irvena R. Jenkins and the remainder to be divided among Gladys Putnam, George William Putnam and Dorothy Putnam as my executor deems best."

George H. Putnam was also nominated as executor. We hereinafter refer to the description found in the will as the "testamentary description".

It is well to observe that it is the above quoted portion of the will that furnishes the crux of the controversy which this appeal seeks to resolve. We note, too, that the testamentary description of the real property above excepted from the gift to the testatrix' husband is wanting in reference to a given meridian and makes no mention of the county or state in which it is located. Otherwise, the description of the 160 acres

comprising the testamentary description is identical with the inventory description of the property which is the subjeect of this suit and was the parcel which the Pettingills mortgaged to Moore in 1913 and later conveyed to him and which Moore in 1914 deeded to Lilla Putnam.

Notwithstanding that Mrs. Putnam died in 1933 and that she owned property in this state adjacent to that first herein described, her will was not probated in Oregon until after her husband's death. He died intestate in 1946. Nor was it probated elsewhere prior to the filing in Douglas county in 1947, 14 years after her death. The probate of Mr. Putnam's estate was begun in 1946 and closed in April 1947. The final order in Mrs. Putnam's estate was entered in April 1948.

Mrs. Pettingill had no knowledge of the existence of her sister's will or the provisions it made for her until sometime after July 1948.

The final order in Mrs. Putnam's estate attempted to confirm title to the subject property in the appellants as heirs of George H. Putnam, deceased, because, as therein stated, "under the terms of said Will of said deceased, all of the property, real and personal, was given and bequeathed unto George H. Putnam, her husband, except certain properties which does not include the property located in Douglas County, Oregon, and described in the inventory and appraisement on file herein".

Because of the incomplete description of the 160 acres referred to in the will, the probate court evidently treated the property first above described as a different parcel concerning which Mrs. Putnam had made no testamentary disposition and held that the title to the fee passed to her surviving spouse and upon his death to his son and daughter, the appellants Putnam.

■ We are not interested in or controlled by any declaration of the probate court concerning the appellants purported title in and to the Douglas county parcel. It avails them naught for the reason that probate courts are without authority to determine and decree title to real property. *Arnold et al. v. Arnold,* 193 Or 490, 496, 237 P2d 963, 239 P2d 595; *In re Estate of Ott,* 193 Or 262, 273, 238 P2d 269; *Harrington v. Jones,* 53 Or 237, 239, 99 P 935.

We refer to it, however, as an interesting bit of the factual history herein involved and because the appellants very apparently rely on the probate court's order of April 1948 in Mrs. Putnam's estate as one of their props for their allegations of ownership and right to possession.

Subsequent to and before the entry of the orders in probate, the appellants began negotiations for the sale of the Douglas county parcel to various timber companies. As an incident to their transactions with prospective buyers, they were informed that the references in Mrs. Putnam's will to Mrs. Pettingill and the heir Irvena Jenkins created a cloud on "their title". They thereupon sought and received a quit-claim deed from Mrs. Pettingill under circumstances upon which we will later elaborate. The heirs of Irvena Jenkins were likewise solicited to give quit-claim deeds but refused to do so. It was their refusal which precipitated this suit and which in turn brought in Mrs. Pettingill as a plaintiff in intervention, praying that the real property described in the will be sold and the proceeds of the sale distributed to those entitled thereto as provided in the will.

After the trial of this matter in the circuit court and before the entry of the decree, Mrs. Pettingill died, on Novemmber 26, 1952, and her heirs and administrator were thereafter substituted in her place.

The Putnams rest their appeal upon four assignments of error. Speaking generally, these relate to (1) the alleged vague and ambiguous quality of the description of the real property as found in the will; (2) the effect, if any, of Mrs. Pettingill's quitclaim deed; (3) Mrs. Pettingill's amended reply; and (4) the computation of the amounts due appellants in the event the land is to be sold pursuant to the directions contained in the will. We will give attention to these assignments in the order presented.

## *The Description of the Real Property*

This first assignment relative to the testamentary description of the property brings to the fore the main issue in this suit. Appellants assert that the description of the real property found in the exception clause of Mrs. Putnam's will is patently ambiguous because it does not give the meridian, county or state in which it is situated and is, therefore, void. They contend that extrinsic evidence is inadmissible to identify the real property as the same parcel included in the inventory of property filed in the probate of Mrs. Putnam's Oregon estate. The Putnams unequivocally declare that there was no substantial evidence of any relationship between the property described in the estate proceedings and the property described in the will.

■ To the contrary, the respondents argue that extrinsic evidence can be employed to identify persons to whom a gift is made and, if necessary, to identify a gift indicated but not clearly or completely described; and, say the respondents, when this is done, the exception clause in Mrs. Putnam's last testament will be found valid. The respondents recognize the rule that evidence extrinsic to the will cannot be invoked to discover the testator's intention; but when the intention is clear, as here, then recourse may be had to

evidence aliunde the will for completing identification of the subjects of the testator's benefaction. In short, such evidence is admissible not to discover intent but to implement the intent which is already evident.

■ The problem, and the only problem projected by appellants' first assignment, is: Did the testamentary description refer to the same property comprehended by the inventory description in Lilla G. Putnam's estate?

Appellants argue that the ambiguity is patent because "Land located in 'Range One (1) West' of any meridian in the United States would wholly satisfy the language of the Will  *  *  *.''

In making an answer to that question, we are called upon in this appeal to solve the ancient problem of whether a defective description of real property in a will is an ambiguity, latent or patent, and, in so doing, determine whether extrinsic evidence is admissible to aid in correcting the defect.

We have earlier set out haec verba that part of the will which is the nub of the controversy and have noted that the testamentary description is correct so far as it goes but incomplete, as suggested by appellants, insofar as it omits reference to the meridian, county and state. There is no question that, excluding extrinsic evidence, it would be impossible to locate the tract if one had to depend alone upon the language of the description found in the will. However, the will does furnish some clues which, with the aid of extrinsic evidence, if admissible, will be an aid in identifying and determining the location of the described premises. These clues are: (1) testatrix considered and called the land "my property"; and (2) the decedent believed an "indebtedness" accrued to her estate "from this property".

The Oregon cases relied upon by the appellants, whence recitals are liberally extracted in support of their contention that the testamentary description is so imperfect as to be insufficient for any purpose, all rest upon various dispositions of real property by lease or sales contracts. Not one involves a devise by will. From *House v. Jackson* (a suit for specific performance of a contract for the sale of real property), 24 Or 89, 97, 32 P 1027, they gather the following as the sole and controlling rule and they claim it to be equally applicable to wills as to other instruments:

"* * * The rule for determining the sufficiency of a description in a deed, *or any other writing in relation to real property,* is as follows: Can a surveyor, with the deed or other instrument before him, locate the land and establish the boundaries? * * *" (Italics ours.)

However, in their effort to give the foregoing excerpt from the House case the distinction of being the prevailing rule here, appellants overlook the following significant statement appearing in the same paragraph from which the above quotation was excised:

"The description contained in the agreement must be so definite as to show what the purchaser supposed he was contracting for, and what the vendor intended to sell. * * * A description of the subject matter in a deed is sufficient when it complies with the maxim, *id certum est [quod] certum reddi potest*: Pomeroy, Specific Performance, §§ 152, 153. * * * The object and purpose of a description of real property is to mark out and designate the boundaries of a portion of the earth's surface, and if this can be done as well by one name as another, that object has been fully accomplished. * * * [The quotation relied upon by appellants appeared at this place in the paragraph.] In Smiley v. Fries, 104 Ill. 416, Schofield, J., says: 'This court has ruled that any description by which the property may be identified by a competent surveyor

with reasonable certainty, *either with or without the aid of extrinsic evidence,* is sufficient.' * * *" (Last italics ours.)

Appellants also quote from the case of *Hink et ux. v. Bowlsby et al.,* 199 Or 238, 244, 260 P2d 1091, using the following as further authoritative support for their view:

"While the courts are tolerant toward imperfect descriptions * * * the rule for determining the sufficiency of a description in a writing relating to real property is expressed in Bogard v. Barhan * * * [52 Or 121, 96 P 673] on page 124 as follows:

"'* * * Can a surveyor with a deed or other instrument before him, *with or without the aid of extrinsic evidence,* locate the land and establish the boundaries? [Followed in the original opinion by citations including House v. Jackson, supra.]

"*and they cannot under our statute [of frauds] permit extrinsic evidence to do more than apply the description as expressed.*" (Italics ours.)

It is interesting to note that the court in *Bogard v. Barhan,* 52 Or 121, 124, 96 P 673, applied these rules to the descriptions before it in these words:

"Plaintiff's property designated as 'his 5-acre residence property lying west of the Catholic Church' does not mention the location thereof by reference even to the county and state; and this is claimed to be too indefinite. But it is said in Devlin, Deeds, § 1012: 'When a doubtful description is to be construed, the court should endeavor to assume the position of the parties, the circumstances of the transaction should be carefully considered, and, in the light of those circumstances, the words should be read and interpreted.' The contract is dated at Woodburn, Oregon, and in the light of that fact, and that all the other property is referred to as at Woodburn, the designation of 'his 5-acre residence property lying west of the Catholic Church,' and

'party of the second part is to occupy his residence property until September 30,' clearly indicates that it is the property in which he was residing in that vicinity, and by extrinsic evidence its location and boundaries may be easily ascertained. At any rate, on the face of the agreement, it is sufficiently definite for identification.

"The same is true of defendant's 15-acre farm. 'Lot 7, block 2, Tooze's addition to Woodburn,' is a definite description on the face of the agreement. At the trial it was suggested that this lot is in 'Tooze's First Addition.' If Tooze platted several additions to Woodburn, it is likely that he designated the first one as 'Tooze's Addition,' and not 'Tooze's First Addition.' At any rate, the designation is not defective or indefinite on its face."

We believe that the description employed in the Putnam will is no more indefinite or defective than those found in the agreement construed in the Bogard case.

With the respective contentions of both parties we are compelled to disagree in part. The rules limiting the admissibility of extrinsic evidence to explain the language of a written declaration of *intention* apply, according to Dean Wigmore, both to deeds and wills. 9 Wigmore, Evidence 3d ed, 211-224, §§ 2465-2467. (Also see ORS 41.740 discussed later.) See 9 Wigmore, Evidence, supra, 216-222, §§ 2466-2467, reading:

"When a person takes part in a *bilateral* act— i.e., a transaction in which other persons share— he must accept a common standard; he cannot claim to enforce his individual standard of meaning * * *. The other party or parties are entitled to charge the speaker with the standard accepted in common. * * * The principle is applicable, not only to *deeds* and *contracts*, but also to all bilateral transactions * * *.

"But a *unilateral* act may be interpreted by the individual standard of the actor * * *; that is,

after resorting to the ordinary sense of words, and the local sense of words, for provisional assistance, we are still entitled to supplant all these by the individual usage, if it appears to have been different from the others.

"The *will* is the typical and almost the only instance of a unilateral act. The sense of the testator is therefore to be the ultimate criterion of interpretation:

"1870, Blackburn, J., in Grant v. Grant, L.R. 5 C.P. 727, 729 (quoting a passage from his own treatise on Sales): 'The principles of the rules of law regulating the admissibility of extrinsic evidence to aid the construction of wills, and of contracts required to be in writing, seem to be the same. But, in applying them, it seems necessary to bear in mind that *there is a distinction between the two classes of instruments.* The will is the language of the testator, soliloquizing, if one may use the phrase, and the Court in construing his language may properly take into account all that he knew at the time, in order to see in what sense the words were used.'

"This principle is to-day universally conceded." (Last italics ours.)

In 3 Page, Wills lifetime ed, 31, § 959, we find:

"Since the courts endeavor to enforce the intention of testator whenever the same can be ascertained by the will, *it is not necessary that the estate devised by will should be described with the accuracy necessary in the case of a deed.* * * * (Italics ours.)

Many years ago this court in *Moreland v. Brady,* 8 Or 303, 34 Am Rep 581, expressed the gist of the foregoing rule recognizing leniency when applied to wills. We find at p. 313:

"Wills are frequently made during the last sickness of testators, and they too often depend wholly upon memory for description of their lands, and in consequence they are liable to great indefiniteness

and occasional error. And on looking into the many cases decided, we find that courts have for a long period of years been compelled to deal with these descriptions in a very lenient manner, in order to reach the true intent of the testator 'where that seemed practicable by the act of construction, and by the admission of oral evidence to remove latent ambiguities.' ''

More recently, in *In re Holland's Estate,* 180 Or 1, 26, 175 P2d 156, this court said: '' * * * Where it is clear that a word or an expression has been omitted from a will, the courts supply it, provided they are certain of the omitted term: 69 C.J., Wills, p. 82, § 1140. * * *''

■ ORS 41.580 (Oregon's statute of frauds) and ORS 114.030, requiring wills to be in writing, do not bar the admissibility of evidence to show the *meaning* of the language employed by the author of the instrument (4 Page, Wills lifetime ed, 655, § 1624; 4 Jones, Commentaries on Evidence 2d ed, 2919, § 1599; 57 Am Jur 681, Wills, § 1049; 69 CJ 144, Wills, § 1178) or to *apply* the description to the land actually covered thereby. 4 Page, Wills, supra, 673, § 1627; 57 Am Jur 694, Wills, § 1077; 59 CJ 156, Wills, § 1185. They do operate, however, to exclude evidence offered to show an intention not otherwise expressed in the writing. 4 Page, Wills, supra, 622-626, § 1617; Thompson, Wills 3d ed, 367, § 232; 57 Am Jur 694, Wills, § 1077; 69 CJ 142, Wills, § 1177. In 4 Page, Wills, supra, 627, § 1617, we find:

''The only purpose and justification of the admission of extrinsic evidence is to explain testator's meaning which is set forth in the words of the will. Assuming that there is a valid will to be construed, it is the place of the court to find the meaning of such will, and not under guise of construction or under general powers of equity to assume to cor-

rect or redraft the will in which testator has expressed his intentions."

On the other hand, ORS 41.740, commonly designated the "parol evidence rule", permits "no evidence of the terms of the agreement, other than the contents of the writing". Continuing, that section reads:

"* * * However, this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.020 [sic—ORS 42.220], or to explain an ambiguity, intrinsic or extrinsic * * *. The term 'agreement' includes deeds and *wills* as well as contracts between parties." (Italics ours.)

ORS 42.220 (erroneously referred to in ORS 41.740 as ORS 42.020) reads:

"In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language he is interpreting."

■ For cases exemplifying that the intention of the testator is the prime consideration in the interpretation of the will and the admission of extrinsic evidence is permissible to aid in the implementation of that intent, see the following Oregon cases involving misdescriptions of devised property and arising from the use of a phrase describing certain land as being " 'the north half of the donation claim of *Bartholomew* Dove' ", whereas the correct designation should have been *Bethuel* Dove. (Italics ours.) *Jones v. Dove,* 6 Or 188, 193, and 7 Or 467. The court in the second and related case said (7 Or 471):

"In the case of Hattie Jones v. Dove, 6 Or. 188, this same question was before this court. In that case the court below had ruled that the variance between the names Bartholomew and Bethuel, was such that no evidence could be admitted to show that

the intention of the devisor was to devise the north half of the claim of Bethuel Dove, instead of Bartholomew Dove. This is the same will that was before the court at that time. This court reversed the judgment of the court below in that case, holding that the will was admissible, and that *extrinsic evidence was admissible to identify the land and to show what particular property was intended to pass or to make certain either the person or thing described.* (Wigram on Wills, 142.) *We see no good reason why that decision should be overruled. \* \* \*''* (Italics ours.)

Also see *Moreland v. Brady,* supra, 8 Or 303, wherein the testator made a gift of Lots 1 and 2 in Block 187, although he owned only Lots 3 and 4 in Block 187. Depending solely upon extrinsic evidence, the court substituted Lots 3 and 4 for Lots 1 and 2. In *Portland Trust Co. v. Beattie,* 32 Or 305, 52 P 89, the testator devised to his wife " 'all that part of the Oregon City land claim not laid off into lots and blocks, and lying in the northeasterly portion of said claim, and containing 85 acres, more or less.' " The land actually contained 160 acres. In that case this court, at p. 309, disposed of the matter as follows:

"The intention of a testator, as expressed in his will, is, of course, the controlling factor in its construction, but there are certain elementary rules or guides which are considered valuable to aid in arriving at such intention. \* \* \* That where a testator misdescribes an estate as to its locality, and there is sufficient appearing on the face of the will, as applied to the subject matter, to show that such description was a mistake, it will not have the effect to defeat the obvious intention of the testator: Moreland v. Brady, 8 Or. 303 (34 Am. Rep. 581); 1 Redfield on Wills, 469. While words cannot be added to a will, yet, in arriving at the intention of the testator, so much as is false in the description may be rejected, and, if enough remains to identify the premises intended to be de-

vised, the will may be read and considered with the false words eliminated therefrom  *  *  *.''

Also see 3 Page, Wills, supra, 27, § 958; Thompson, Wills, supra, 370, § 235; 9 Wigmore, Evidence, supra, 251, 255, §§ 2476, 2477; 57 Am Jur 681, Wills, § 1048; 69 CJ 161, Wills, § 1186.

In an extensive and excellent annotation in 94 ALR 26-293 on the subject of "Admissibility of extrinsic evidence to aid interpretation of will", with special reference at pp. 131-158 as to ambiguous, inaccurate or indefinite descriptions of real property, the editor, at p. 158, under the heading of descriptions applicable to several parcels of property says: "It is well settled that where the description in the will applies indifferently to two or more pieces of property, a latent ambiguity exists, to resolve which extrinsic evidence is admissible to show which was meant by the testator."

Mrs. Putnam's will exemplifies the use of a description that can be applied "indifferently to two or more pieces of property". In *Black et al. v. Richards et al.*, 95 Ind 184, 186, the gift of real property in a will was described as follows: " '* * * The west half of the southwest fr., section (19) nineteen, township (22), range (1 W), contain (72) seventy-two and (40) hundredths acres.  *  *  *' '' We note that one of the elements of uncertainty is similar to that found in the instant will, i.e., an absence of meridian and reference to the county or state in which it was situated, thereby giving rise to the suggestion that parcels with the same descriptive elements can be found in more than one state, where lands were surveyed in terms of congressional townships. The Indiana court held these elements could be supplied by extrinsic evidence, saying at p. 190:

"The description complained of in this case describes a tract of land, but designates it so imperfectly that we can not say, as a matter of judi-

cial knowledge, that it lies within this State. Every congressional township contains a section 'nineteen,' and there are many such townships in the northwestern States and territories, which are known as number 'twenty-two.' Considered, therefore, with reference to these extraneous circumstances, the description is ambiguous and imperfect, and hence uncertain in its particular application to the tract of land described in the complaint, or to any other tract lying within this State. This uncertainty is consequently of that species which may be cured by extrinsic evidence, and hence of a character which does not impair the validity of the will."

We note that among the cases cited as precedent for the holding in the Black case is the Oregon case of *Moreland v. Brady,* supra. Also see *Flynn v. Holman,* 119 Iowa 731, 94 NW 447, 448. In the Flynn case as in the Black case, the court permitted introduction of extrinsic evidence to identfy land over objections substantially identical to those here made by the appellants.

Turning to 4 Page, Wills, supra, 650, § 1623, for a definition of "latent ambiguity", as employed in 94 ALR at p. 158, we read:

"* * * A patent ambiguity is defined as one which is apparent upon the face of the instrument, as where in wills the same tract is disposed of in different clauses to different individuals. A latent ambiguity is defined as one which is not discoverable until extrinsic evidence is introduced to identify the beneficiaries or the property disposed of by will, when it is developed by such evidence, either that the description in the will is defective, or that it applies equally to two or more persons or things. This distinction has been repeatedly recognized by the courts, and many modern decisions say that extrinsic evidence is admissible to explain a latent ambiguity but not to explain a patent ambiguity. * * *"

The foregoing is a conventional definition having its roots in Lord Bacon's definition of latent and patent ambiguities made in his comment upon his twenty-third maxim. 94 ALR 46. Notwithstanding the foregoing definition, there is authority that there is an intermediate class of cases which partake of the nature of both latent and patent ambiguity, and hence are not to be governed strictly by the rules applicable to either latent or patent ambiguity. *Higgins v. Tennessee Coal, Iron & R. Co.*, 183 Ala 639, 62 So 774. Also see 94 ALR 47.

Thus in the instant case if the defective description in the will is an ambiguity at all, it must appear that it applies equally to two or more pieces of property, i.e., that two separate parcels fit the description so far as it goes, but with the additional aid that the testatrix referred to it as "my property". For a collection of cases determining the words "my farm", "my land", "my lot", etc., to be sufficient descriptions, see 94 ALR 155. Also see Thompson, Wills, supra, 368, § 233; 4 Page, Wills, supra, 639, § 1620, with special attention to that part reading:

> "Where testator describes the property devised by lot number or by township, range, section and quarter section, but does not locate it in the correct section or range or the like, the weight of authority is that extrinsic evidence is admissible to show exactly what real estate testator owned. If he owns any real estate which corresponds in part to the description in the will, the court will reject the incorrect part of the description and will pass the realty conveyed by the correct description."

Referring again to the statutory "parol evidence rule" (ORS 41.740), Professor Page states in 4 Page, Wills, supra, 655, § 1624:

> "In any case where it is necessary to invoke extrinsic evidence to assist in the construction of a

will, it is recognized by the great weight of authority that evidence of the facts and circumstances existing at the time of the execution of the will, and known to the testator, is admissible not to contradict the meaning of the will, but to 'enable the court to place itself in his situation, to see things as he saw them, and to apply his language as he understood and intended it.' ''

Applying the foregoing rule to the instant case, the court should, as the trial judge did, admit evidence to determine whether at the time of the execution of the will the testatrix owned any property to which the description contained in the will would apply. If the evidence confirms the fact of ownership, the respondents' burden has been satisfied and the intention of the testatrix must be enforced.

Here there was no showing that testatrix owned more than one parcel of property fitting the description in the will. Under the circumstances, the ambiguity disappears and further proof of testatrix' intention becomes unnecessary.

We turn now to the evidence in the record available to test the sufficiency of the intervenor's case, insofar as it demonstrates that the incomplete description found in the will is the same property in which the appellants seek to quiet title in themselves.

In our quest for extrinsic evidence of the missing meridian, county and state where the property of the testamentary description is situated, we begin with two factors of identification found within the will itself and previously noted. First, we find the property excepted referred to as "my property", meaning it is property owned by the testatrix. Second, we note the phrase "And of the indebtedness accruing to us from this property". This last phrase we read as referring to some advancement of money or value relating directly to the property in question.

The land owned by the testatrix having a description identical to the testamentary description is identified by (a) the petition for the probate of the Putnam will made and sworn to by Gladys Putnam, one of the appellants, which represents Lilla G. Putnam as being the owner of the identical property herein involved; (b) the inventory filed in the probate of Mrs. Putnam's estate; (c) the chain of title to the parcel of the inventory description; and (d) the pleadings.

The inventory and appraisement filed on February 20, 1948, in the Lilla Putnam estate and introduced as plaintiffs' Exhibit B lists as decedent's only property: "NW ¼; N ½ of SW ¼; SW ¼ of SW¼; NW ¼ of SE ¼ of Section 20, Twp. 24 S. R. 1, W.W.M., Douglas County, Ore." The "NW ¼" of section 20 is, of course, property owned by Lilla G. Putnam but not a part of the original Pettingill parcel and therefore not involved here. It no doubt is the original timber claim of Mrs. Putnam, then Lilla Hendrixson, a claim which, as Mrs. Pettingill testified, was taken about the same time the Pettingills acquired their claim and which was "in the same neighborhood" as the land in dispute.

The chain of title to the land of the inventory description begins with the Pettingills and finally reposes in Lilla Putnam. This is disclosed by the following instruments shown by the record here, all conveying or dealing with that 160 acres: (1) a patent dated October 3, 1904, from the United States to John F. Pettingill (husband of the intervenor Katherine Pettingill) of Yamhill county, Oregon; (2) a mortgage, dated May 6, 1913, from the Pettingills to L. A. Moore to secure the payment of a note for $250 and interest, due one year after date; (3) a warranty deed, dated May 12, 1914, from the Pettingills, husband and wife, to L. A. Moore; (4) a satisfaction of mortgage dated February 2, 1915,

from L. A. Moore to the Pettingills satisfying and releasing their mortgage to him dated May 6, 1913; and (5) a warranty deed dated February 4, 1915, from L. A. Moore and wife to Lilla G. Putnam for a recited consideration of $400.

Turning to the intervenor's complaint, we find that in paragraph IV Mrs. Pettingill alleges "That during the lifetime of Lilla G. Putnam, now deceased, she was the owner in fee of the hereinbefore described real property [previously described by the inventory description]." This allegation is admitted by the appellants Putnam in their answer to Mrs. Pettingill's complaint in intervention.

From the foregoing, the following things are made evident beyond contradiction: (1) the property in which the appellants seek to quiet title was once owned and mortgaged by Mrs. Pettingill's husband; (2) the title subsequently vested and remained so vested in Lilla Putnam until the time of her death; and (3) it was the only property that Mrs. Putnam owned when she died which embodied all the elements of the testamentary description.

We are told that the testatrix once owned real property in the states of Washington and Wisconsin; but the evidence is that she had disposed of it before she filed her timber claim in Douglas county, which filing was coincident with or near the time of Mr. Pettingill's filing. We also note that the prime and only probate, or what would ordinarily be the domiciliary probate of Mrs. Putnam's will, was made in Oregon 14 years after her demise in the state of Minnesota where she resided at the time of her death. There is no record of her ownership of any property, real or personal, elsewhere or any ancillary probate of her estate, if she had any outside of Oregon, and most certainly no

record that she owned two or more parcels having the same elements of description found in the will.

Thus far we are satisfied that when Mrs. Putnam spoke in her will of "my property", she intended the property situated in Douglas county and later inventoried as her property in the probate of her estate in that county. The "indebtedness" phrase of the will is perhaps not so necessary to pursue because of the clear and complete record which identifies the description in the will with Mrs. Putnam's property in Douglas county. However, because the testimony of Mrs. Pettingill fortifies this conclusion, we give the matter of the will's reference to "indebtedness" our further consideration.

Mrs. Pettingill's testimony was given by deposition on December 16, 1950, when she was 76 years old. She was in a convalescent home in Newberg where she had been since January 1949, suffering from extreme nervousness and palsy. The deposition was introduced in evidence at trial time in lieu of the witness' personal appearance. Concerning the "indebtedness" feature, Mrs. Pettingill testified in response to questions propounded by her counsel, John Carson:

"Q Now, this proceeding involves particularly the N ½ of the SW ¼ and the SW ¼ of the SW ¼ and the NW ¼ of the SE ¼, all in Section 20, Township 24 South, Range 1 West of the Willamette Meridian, in Douglas County, Oregon. Are you more or less familiar with that land, Mrs. Pettingill?

"A I never have seen it.

"Q You have never been on the land yourself?
"A No.
"* * * *

"Q While you and Mr. Pettingill were the owners of the property, did you execute a mortgage on it to a man by the name of L. A. Moore?
"A Yes.

"Q Would that be along about May 6, 1913? Would that sound about right to you?

"A Yes.

"Q Well, later, what happened to the property that I have described, Mrs. Pettingill?

"A Well, my sister gave us the money to pay Mr. Moore.

"Q To pay off this mortgage?

"A Well—

"Q Well, to secure the loan that you had made with Mr. Moore, the record would indicate that you, among other things, executed a warranty deed to Mr. Moore on May 12, 1914, and that later Mr. Moore and his wife on February 4, 1915, deeded the property to Lilla G. Putnam, the lady whose name is mentioned in the complaint in intervention as the decedent in the estate which is somewhat involved.

"A Yes.

"Q Was that the way it happened?

"A Yes, just as near as I remember.

"* * * *

"Q Well, now, why was the deed given to your sister Lilla G. Putnam?

"A Because she had given me money.

"Q And what understanding did you have with Mrs. Putnam as to how she should hold the title to the real property?

"* * * *

"A She said that when the other bills were paid, whatever was left was to come to me.

"Q And it was on that basis that this transaction went through betweeen you and your husband on one side, and your sister Mrs. Putnam on the other?

"* * * *

"A Yes.

"Q How much money did Mrs. Putnam advance for you, do you remember?

"A No, I do not. She gave me money at different times.

"Q But you don't know what the amount of that would be?

"A No I don't.

"Q Well, apparently at the time of the execution of the deed from the Moores to Mrs. Putnam, the consideration given was $400.00 that is, in order to get Moore out of it. Does that sound about what it was?

"A Probably.

"Q But you don't have any independent recollection as to the exact amount?

"A No, I do not.

"\* \* \* \*

"Q Mrs. Pettingill, in case it is not clear in the record, I wish you would repeat, please, what the understanding was with your sister Lilla G. Putnam, when she acquired the title to the premises involved in this proceeding. What understanding did you have with her?

"\* \* \* \*

"A Well, she gave me the money to pay that off, and I gave her the deed, and she said that when the land was sold,—they would keep up the taxes on it, and when the land was sold they would take out what they had paid for taxes, and all above that would be mine.

"Q Would she get back the money she had advanced to you? For instance, the money she advanced to pay off Moore?

"\* \* \* \*

"A Not that I remember.

"Q So far as you know, did Mrs. Putnam keep the taxes up and make the payments, whatever public charges there were against the property?

"A Yes.

"Q Well, were you to pay her back the amount she sent you to pay off Mr. Moore?

"\* \* \* \*

"A No.

"Q In other words, that was an advance to you, and she would pay the taxes thenceforward and hold it for your benefit?

"* * * *

"A Yes.

"Q And when the property was sold she would get back what she had advanced and you would get the remainder. Is that it?

"* * * *

"A She would get what she had put in taxes.

"Q Was your sister in pretty good financial circumstances?

"A Well, yes and no. She had taken several claims; she had a homestead in Wisconsin at one time but she sold it; and she had some timber land in Washington."

Definitely, the testatrix' testamentary phrase about the "indebtedness accruing from this property", meaning the property incompletely described in the will's "exception" provision wherein the phrase is employed, is made understandable by the testimony of Mrs. Pettingill and becomes an additional medium for holding that the property of the inventory description and the testamentary description is one and the same parcel. Further support is garnered from the tax receipts in evidence disclosing payment of taxes on the former Pettingill parcel by Mrs. Putnam in an amount which the trial judge found to aggregate $1,285.08.

We find no merit in appellants' first assignment of error. In what we hereinafter say, we will treat the description in the will as if it were complete in every respect and identical to the description found in appellants' complaint.

### The Pettingill Quitclaim Deed

■ Appellants next assert that the court erred in failing to give effect to the quitclaim deed executed by

the grantor Katherine A. Pettingill, the intervening plaintiff here, in favor of the grantees George W. Putnam and Gladys Putnam, the plaintiffs in this matter.

This deed was dated September 24, 1948, and signed by Mrs. Pettingill by use of her mark. We mention this as an indication of her then state of health for in all the instruments earlier referred to, i.e., the Moore mortgage and the deed to Moore, she signed her name in full with her own hand. The deed was acknowledged on the same day before Nelson A. Frost, a notary public and attorney now deceased, but then practicing in Newberg. The deed purported to release and quit-claim all the grantor's right, title and interest in the property in controversy. Shortly afterward, it was mailed by Mr. Frost to the Eugene attorney who prepared it. It was not recorded, however, until nearly two years later, on September 8, 1950, and about nine months after the filing of the instant suit. The attorney who prepared the deeds and carried on the correspondence concerning them, hereinafter referred to, was not of counsel for appellants in this appeal.

We will have more to say concerning the circumstances attending the execution and alleged delivery of this deed but now direct attention to plaintiffs' claim as to the deed's legal efficacy in this matter. This they summarize with these words: "Mrs. Pettingill deeded *her interest in the land* to appellants and cannot now question that deed." (Italics ours.) Appellants also say: "* * * *Mrs. Pettingill made no claim to an interest therein* [meaning the real property in controversy] *from the time of Lilla Putnam's death until she filed her complaint in intervention in 1950 * * *.*"

The most complete and convincing answer to appellants' reference to Mrs. Pettingill's alleged "in-

terest in the land'' is that we cannot find that she ever had any interest therein greater than an inchoate right to dower after the patent to her husband. This was extinguished by the Pettingill's warranty deed to Moore in 1914. After Mrs. Putnam's death in 1933, the only ''right'' she had was a right to invoke the aid of equity to effectuate the delivery of the specific legacy of money provided for her in her sister's will and payable from the proceeds of the sale of this land.

The chain of title, as we have noted, discloses that the lands in question were patented to John Pettingill and that the rights of both Pettingills were extinguished by the transfer to Moore in 1914. There is no evidence showing that either of the Pettingills ever became reinvested with any interest in the title. If we assume that such title as Mrs. Putnam claimed was that of a mortgagee, then Mrs. Putnam held for the benefit of John Pettingill. Carrying the assumption of the mortgagor-mortgagee relationship forward, it would follow that upon Mr. Pettingill's death intestate in 1943, such title as he then had, if any, passed to his heirs, subject to dower rights of his widow and the lien of the mortgagee, if any. We know he left surviving a daughter and two sons. However, such assumptions are specious and worse than speculative. No suggestion that Mrs. Putnam held the title as a trustee or mortgagee is asserted by the appellants. Any possible trust relationship is impliedly repudiated on the part of Mrs. Pettingill by the very theory of her right to the relief prayed for in her complaint in this matter when she claims solely as a legatee of personal property.

The foregoing conclusions respecting Mrs. Pettingill's interest in the title to the real property are consistent with Mrs. Pettingill's silence concerning a claim of title before and after 1933, if in fact she had

any knowledge of her sister's death at that time. The contents of her sister's will and the fact that her sister had died testate were not revealed to her until she received a letter in Newberg from the Eugene attorney for the Putnams, when he wrote to her in July 1948 in behalf of his clients, the plaintiffs. It was in that letter he tendered for her signature the challenged quitclaim deed. It was then that she was apprised for the first time that she was her sister's beneficiary—not, however, as one owning any part of fee title in the land but as a legatee for a specific legacy to be paid from the proceeds of the sale of the land. In short, 15 years after her sister died, plaintiffs' attorney informed her that she had inherited an estate in personalty.

We are not unmindful that the able trial judge found Mrs. Putnam held title as security for money advanced. We do not think the evidence warrants that conclusion, particularly in view of what we have above said concerning the title. In this connection we also observe that the claim which Mrs. Pettingill does assert through her complaint not only negatives any pretense to any right, title or interest in the land described in her sister's will, as an owner, mortgagor or otherwise, but actually coordinates with and accepts her sister's construction of title to the effect that it was, as her sister in the will asserted, "my property". In thus accepting her sister's benefaction, she necessarily accepts *less* than she might otherwise have had, if she claimed and recovered the title subject to any equitable lien in favor of Mrs. Putnam for monies advanced. Among other things, had the land been held by Mrs. Putnam as security for Mrs. Pettingill's debt, Mrs. Pettingill would have had the right to ignore the provisions of the will for her benefit, redeem the land

from her sister's lien, if any, and herself dispose of the property in her own time and at her own price.

Forgetting for the moment the Pettingill-Moore-Putnam transactions during the period of 1913-1914, transactions 20 years old at the time of Mrs. Putnam's death and 36 years old when the instant suit was instituted, no one would seriously venture to claim that the language of the will recognized any title interest in Mrs. Pettingill to the real property described in the will, nor would they venture to claim that the provisions which Mrs. Putnam created for the benefit of her sister were anything more than a right to a specific legacy given as a delayed recognition of some earlier moral promise made between the sisters.

■ A testamentary provision that specific realty be sold and the proceeds go to certain parties is a specific legacy. 57 Am Jur 945, Wills, § 1413; 2 Alexander, Law of Wills, 981, § 655; 4 Page, Wills, supra, 119, § 1396; 4 Schouler, Wills 6th ed, 2553, § 3055; Thompson, Wills, supra, 699, § 481.

When a beneficiary has the right to receive the proceeds from land rather than the land itself, his interest is personal property. It results from the direction to sell the land which works an ''equitable conversion'' of the real estate into personalty. 2 Alexander, Law of Wills, supra, 1167, § 807; 3 Page, Wills, supra, 929, § 1337; 1 Pomeroy, Equity Jurisprudence 4th ed, 196, § 161; 3 Pomeroy, Equity Jurisprudence, supra, 2744, 2758, §§ 1159, 1164; 1 Scott, Trusts, 691, § 131; Thompson, Wills, supra, 154, § 97.

Therefore, if the quitclaim can be said to have released anything of value to the plaintiff-grantee, it was nothing more than Mrs. Pettingill's right to seek equitable aid in compelling a sale of the real property

and a division of the proceeds therefrom in the manner directed by the will.

Perhaps we seem to dwell on the legal character of Mrs. Pettingill's testamentary gift from her sister more extensively than may appear necessary at this point. This we do to avoid a repetitious treatment of the subject later because, as will be discovered, the legal character of the gift becomes our reason for repudiating certain claims which the appellants make under their fourth assignment of error.

■ A careful reading of the evidence adduced compels the conclusion that the quitclaim deed was wanting in any efficacy for the following reasons: (1) there was no adequate consideration for it; (2) there was *no* valid delivery; and (3) the circumstances attending its execution were tinctured with such vague and inexact representations concerning the value of the property that they are fraudulent in character when weighed against the larger background of secrecy and unexplained delays here present. Certainly, we cannot accept appellants' premise that it was a transaction wherein the parties were dealing at arms' length.

Mrs. Pettingill in 1948 was 74 years of age and suffering from the physical illnesses previously referred to. Because of her physical condition and want of business experience and training, she was unable to carry on any business transactions without help. Her daughter-in-law, Mrs. Howard H. Pettingill, acting in her behalf, made this fact known to appellants and their attorney a very few days after the attorney sent Mrs. Pettingill the quitclaim deed. Mrs. Pettingill also entertained a great fear of lawsuits. The extent of this fear and its bearing with reference to the execution of the deed are made manifest by the testimony of Mrs. Howard Pettingill, who acted as an aide to her hus-

band's mother throughout the period of the deed transaction and who testified:

> "Well, that was not the main reason why she signed the deed [i.e., the advice of Mr. Frost, the Newberg attorney]. Her health was breaking so rapidly under the strain and the fear of this lawsuit, we were afraid she would not live any time and we figured that if the Putnams would do the right thing and pay her something, it would relieve her mind and she might have something while she was here rather than carry it through to a lawsuit, of which she was so deathly afraid and that was the main reason why she signed the deed."

The date of Mrs. Pettingill's death was a month before the entry of the decree in this matter. We also observe that appellants embrace Mrs. Pettingill's fear, as testified to by her daughter-in-law, as one of the important ingredients of their tenuous assertion of consideration for the deed.

Appellants argue that this "fear" plus a "conditional promise to pay $500" constituted the entire consideration. Assuming that fear—the fear of lawsuits and the fear of early death—entertained by a very sick and elderly woman, together with a promise to pay money, no part of which grantor ever received, constituted a consideration for the quitclaim deed, then it introduces an element which cannot be overlooked and presents circumstances which compel us to apply the relief suggested in *Toney v. Toney,* 84 Or 310, 318, 165 P 221, where we said:

> "Inadequacy of consideration may be so gross as to shock the conscience and in such case equity will seize on slight circumstances of fraud and oppression as a ground for setting aside the transaction: 4 R.C.L. 501; Archer v. Lapp, 12 Or. 196, 202 (6 Pac. 672); Sherman v. Glick, 71 Or 451, 461 (142 Pac. 606). This principle is applicable to a transfer of property without any consideration to support

it, where the relations of the parties preclude the conclusion that a gift was intended. * * *''

The land in question lay several hundred miles south of Newberg where Mrs. Pettingill had long resided and where she was living at the time of her death. She had never been upon the place. Moreover, neither did Mrs. Pettingill nor those of her family circle know that the parcel which Mrs. Putnam directed sold for the use and benefit of Mrs. Pettingill and other relatives of the Jenkins family was reputed to have a large amount of merchantable timber of considerable value. The circuit judge found that the timber was in excess of six million board feet and worth more than $50,000, at least at the time of trial if not at an earlier date. We would not feel warranted in saying that it was of that value in 1948 but do think the evidence justifies our conclusion that had the Putnams paid Mrs. Pettingill $500 in that year for her deed, they would have obtained an unconscionable bargain.

The appellants had started to sell this timber before they probated Mrs. Putnam's will. They knew something of its value in 1947 when the property was inventoried. These facts were known to the Putnams and their attorney when the latter sent forward the deed in July 1948 and when the appellant George W. Putnam wrote to Mrs. Pettingill via her daughter-in-law on August 28, 1948. In that letter he gingerly avoided a request to pay $500 for Mrs. Pettingill's quitclaim deed, with the statement that to make such payment raised a ''serious question whether it will be worthwhile for us to proceed in closing up this matter and effecting a sale by this arrangement * * *.'' The suggestion of low value intimated in Mr. Putnam's letter is made more definite in their attorney's letter of September 1, 1948, where he says: ''* * * as Mr.

Putnam knows, the property concerned *is not very valuable* * * *." (Italics ours.)

■ We are not disposed to make an extended analysis of the facts which prompt us to hold that there is no merit in appellants' second assignment of error, except to observe that an examination of the entire correspondence passing between the parties relative to the deed, consisting of nine letters, convinces us that Mrs. Pettingill's deed was sent to plaintiffs' attorney with the understanding that it would *not* be accepted or delivered to the Putnams unless deeds of like character were received from the defendants Jenkins, children of the beneficiary Irvena R. Jenkins, deceased; and in the event the Jenkins' delivered their deeds of like tenor, Mrs. Pettingill was to receive $500. This conclusion finds support in the letter of September 1 from appellants' attorney wherein he refers to the $500 consideration, saying:

"Mr. Putnam has left the matter in my hands. If I could be assured and actually receive a quit-claim deed *from Mrs. Pettingill and from all the heirs of Irvena R. Jenkins,* then I would feel more inclined to advise Mr. Putnam to pay you a sum of money as then a legal suit to clear the title would not be necessary." (Italics ours.)

In his later letter of September 30 acknowledging receipt of the Pettingill deed, it is noteworthy that the Putnams' attorney carefully avoided formally accepting delivery of the deed in behalf of his clients, the grantees. The reason for this becomes more apparent when we read the last paragraph of that letter. It says:

"I will now contact the heirs of Irvena Jenkins to attempt to secure their signatures on a similar deed. *Of course if they do not cooperate then the deed by your mother-in-law will be of no avail.* If they, too, cooperate, I shall, as I have previously stated, advise Mr. Putnam to compensate Mrs.

Katherine Pettengil [sic] and he has expressed his willingness to do so." (Italics ours.)

Recently, Mr. Justice Tooze, speaking for the court in *Lancaster v. May, as Administrator,* 194 Or 647, 654, 243 P2d 268, well said:

"It is a well-established rule of law that delivery is an indispensable requisite to the validity of a deed. To pass title, the grantor must give up dominion and control of the deed. The delivery must be made by the consent or with the acquiescence of the grantor. To be effective, such delivery must be unconditional. It is not necessary, however, that the delivery be made to the grantee personally. To constitute a complete delivery, there must, of course, be acceptance by the grantee. Whether there has been a delivery is a question of fact rather than of law, depending upon the intent of the grantor to vest an estate in the grantee. * * *"

Also see *Mullen v. Flynn,* 71 Or 62, 65, 142 P 338.

No deeds were ever secured from the Jenkins heirs and, therefore, there was no valid delivery of Mrs. Pettingill's quitclaim deed to the Putnams.

*The Order Amending Intervenor's Reply*

■ Appellants urge that the circuit court erred in allowing the respondent Pettingill to amend her reply to plaintiffs' answer. The case was tried July 16, 1951. The amendment was permitted by an order nunc pro tunc in January 1952 as of July 30, 1951, when, as the order recites, the respondent moved for leave to amend her reply by including a general denial to the four separate defenses to the intervenor's answer to her complaint, in addition to her previously-made further and separate reply thereto. The verity of the order is not challenged, nor is the fact that when the court allowed the amendments made, the case had not been submitted. ORS 16.390. The appellants claim that

the court had no power to permit the amendment and abused its discretion in so doing.

The separate defenses which the original reply failed to specifically deny may be summarized as follows: The first defense was an attempted defense of estoppel by reason of the quitclaim deed. The second defense attempted to set up the defense of laches because of the lapse of two years between the time of giving the quitclaim deed and bringing the suit in intervention. The third defense challenged the complaint's attack on the final order of the county court in the probate of the estate of Mrs. Putnam wherein that court decreed the appellants here to be the owners of the property in controversy. The fourth and last separate defense alleges:

> "That if this court finds that it does have jurisdiction to construe said will and to reverse or modify the final order of said County Court in this action, to which jurisdiction plaintiffs specifically object, that said provision of said will is indefinite, invalid, and void and that plaintiffs are the sole owners in fee simple as heirs at law of their deceased parents, Lilla G. Putnam and George H. Putnam."

Although the reply before amendment did not generally or specifically deny these four separate defenses of appellants' answer, there was no intimation during the course of the trial that the reply was defective in the respect indicated. In this matter, as in *Pacific Co. v. Cronan,* 82 Or 388, 390, 161 P 692, the testimony of Mrs. Pettingill, as intervenor, in support of her case was the first taken by deposition. This was taken nearly two and a half years before the time of the trial. It must have been apparent to appellants' counsel then that she was proceeding upon the theory that the matter contained in appellants' four defenses

to her complaint was in issue and that a negation of what was then pleaded was relied upon as a part of her defense. (82 Or 391.) No objections were made or saved as to any of the testimony so given by Mrs. Pettingill. When the deposition was later introduced at the trial in lieu of her presence and oral evidence, the only objection made to the entire deposition was that it was incompetent, irrelevant and immaterial "in view of Pettingill's Exhibit 6, which is the deed from Katherine Pettingill to George W. Putnam and Gladys Putnam."

Indeed, we cannot discover one place in the record where counsel for appellants specifically points out or calls to the attention of the court that the matters pleaded in their four separate defenses to respondents' complaint in intervention had not been specifically denied by the intervenor's reply. (82 Or 392.)

On several occasions appellants' counsel objected to the admissibility of evidence concerning the consideration or want of consideration for the deed on the ground that it "admittedly was given" or the deed "admittedly was delivered"; but such claimed "admissions", if any, might have referred to any one of several matters other than any admissions resulting from the failure of the reply to deny any material allegations of appellants' answer to the intervenor's complaint, such as the executed and recorded quitclaim deed from Mrs. Pettingill to the plaintiffs Putnam which she early offered in evidence, without objection, or the affirmative recitals in her reply which alluded to the deed in making argumentative denials of the allegations in appellants' affirmative answer.

The objections made to the testimony offered in behalf of Mrs. Pettingill, while perhaps technically sufficient in form, were not calculated to inform the court or opposing counsel of the particular defect

which the plaintiffs relied upon. What we said in *Pacific Co. v. Cronan,* supra, at p. 392, we repeat and apply here:

"The allowance or refusal of an amendment is largely a matter of discretion of the court, and must depend upon the peculiar circumstances of each particular case; the general rule being that the ruling of the trial court upon the question will not be disturbed unless there is an abuse of discretion or an absolute disregard of some affirmative statute. It is also universally held that the courts should be liberal in granting such amendments when it is evident that such permission will be in furtherance of justice, and this is particularly the case in respect to defendants: Bliss, Code Pleading (3 ed.), § 430; 1 Cyc. 518; 31 Cyc. 422. * * *"

We are also persuaded by the words of Mr. Justice McBride in *Pacific Co. v. Cronan,* supra, that this third assignment has no merit. He said, at p. 391: "* * * we do not think the rule goes so far as to prohibit the amendment of what, in view of the facts in the case, was an obvious clerical error or oversight. * * *"

### The Indebtedness of Katherine A. Pettingill

Appellants' fourth and last assignment of error is addressed to the *amount* which the circuit court *determined* to have been due plaintiffs as residuary beneficiaries of the proceeds of the item of "indebtedness to us" referred to in the provision of the will directing the sale of the real property. As found by the court, this amount was $4,089.71. Appellants argue that this should be increased to $4,429.95, an increase of $340.24. This claimed increase is made up of the following items: (1) interest on the original loan of $400 to and past October 1, 1952; (2) interest on taxes to and past October 1, 1952; (3) 50 per cent of $292.50 as the cost of administering the estate of Lilla Putnam,

deceased, together with interest thereon from March 9, 1948; (4) $52.53 paid as inheritance taxes because of the parcel here involved and interest; and (5) $75 as the cost of cruising the contested parcel.

We are content to leave the court's determination as we find it. There are two reasons warranting a rejection of appellants' proposals in any amount in excess of $4,089.71. The first is that the gift to Mrs. Pettingill is, as we heretofore pointed out, a specific legacy. Specific legacies are exonerated from primary liability for the debts of a decedent's estate. *Noon's Estate,* 49 Or 286, 292, 88 P 673, 90 P 673; ORS 116.720 and 116.730. The estate of Lilla Putnam, as shown by the record, had other property of substantially equal value which the testatrix did not specially devise or bequeath and which was *not* subject to homestead or other exemptions and was available to satisfy any such charges. The last three items which appellants seek to charge against respondents are items appropriately payable from that portion of decedent's estate.

The second reason for rejecting appellants' fourth assignment of error springs from the fact that appellants offer no excuse or explanation for the failure to probate the stepmother's will for a period of more than 14 years after her death. In the absence of any excuse exonerating their father or themselves for this unusual and illegal delay in tendering Mrs. Putnam's will for probate (ORS 115.110) if, in fact, he or they had her will in possession at any time after her death, we feel that it would be inequitable and unconscionable to surcharge Mrs. Pettingill's gift with interest on the original debt or taxes paid beyond what the circuit court had already determined to be due, and we recoil from so doing.

Indeed, if the respondents had not already expressed themselves as satisfied with the court's com-

putation by failing to cross appeal, we would have been disposed to have tolled the running of all interest as of a date which would be about a year after Mrs. Putnam's death in 1933 and a reasonable time in which the executor might be required to sell the realty and fulfill Mrs. Putnam's testamentary directions.

The decree of the circuit court is affirmed.